485 F.2d 1251
 Alexander TCHEREPNIN et al., Plaintiffs,
v.
Robert FRANZ et al., Defendants, Peerless Closure Company,
Defendant-Appellant.
Alexander TCHEREPNIN et al., Plaintiffs,
v.
Robert FRANZ et al., Defendants, Henry McGurren,
Defendant-Appellant.
Alexander TCHEREPNIN et al., Plaintiffs,
v.
Robert FRANZ et al., Defendants, Braewood Building
Corporation, Defendant-Appellant.
 Nos. 18933, 18952 and 18958.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 16, 1972.
Decided July 27, 1973.
Rehearing Denied Sept. 12, 1973.
 
 Don H. Reuben, Steven L. Bashwiner, Chicago, Ill., for cross-plaintiffs.
 Zeamore A. Ader, Chicago, Ill., for Thelma Brynjolfsson, plaintiff.
 Fred Weiszmann, Paul E. Hamer, North Brook, Ill., Richard F. McPartlin, Chicago, Ill., for cross-defendants-appellants.
 Before FAIRCHILD, CUMMINGS and STEVENS, Circuit Judges.
 FAIRCHILD, Circuit Judge.
 
 
 1
 These appeals represent still another aspect of the long and complex litigation occasioned by the insolvency of City Savings Association (hereinafter City Savings).[1]
 
 
 2
 They follow from the district court's imposition of a constructive trust upon a number of tracts of land in the Chicago area for the benefit of City Savings. Appellants Braewood Building Corporation and Peerless Closure Company each claim title to particular parcels as bona fide purchasers and seek to overturn the district court's imposition of a constructive trust. Appellant McGurren, in whom title to a number of these properties was vested as trustee, contends the court erred in entering certain findings which reflect upon him individually.
 
 
 3
 I. Background.
 
 
 4
 The proceeding from which these appeals arise is ancillary to an action initiated by a group of shareholder-depositors of City Savings in 1964. The original plaintiffs alleged fraudulent solicitation of deposits by City Savings, a state chartered savings and loan association, and sought rescission of their purchases of withdrawable capital shares under the Securities and Exchange Act of 1934. After the Supreme Court confirmed the applicability of the 1934 Act and hence jurisdiction of the district court over their claim[2] the district court removed state appointed liquidators then having custody of City Savings' assets, appointed federal receivers,[3] and instructed the receivers to litigate all claims of City Savings as ancillary to the principal action.
 
 
 5
 On April 4, 1969, the receivers, in the name of defendant City Savings, filed a four count second cross-complaint against officers and employees of City Savings, as well as other persons. The cross-complaint alleged, among other things, a conspiracy and land fraud scheme, pursuant to which excessive loans were made in violation of fiduciary duty and with intent to defraud, and cross-defendants acquired parcels of real estate for personal benefit in violation of duty to City Savings. Count II listed tracts which allegedly were so acquired, including the properties claimed by appellants Braewood and Peerless, and requested the imposition of a constructive trust.
 
 
 6
 On July 24, 1969, the district court granted the receivers' motion to amend the cross-complaint. This amendment added a fifth count and additional property to Count II of the cross-complaint.
 
 
 7
 On August 7, 1969, the district court ordered appellant Henry McGurren as trustee to show cause why title to the property claimed by Braewood should not be conveyed to City Savings. McGurren defended by alleging that Braewood acquired this property from Suburban Life Builders Corporation in good faith in return for services rendered. From September 29 to October 1, 1969, hearings were held on the issue of ownership of this property. By stipulation of the parties, these proceedings were consolidated for briefing and final order with the proceedings held in May, 1970 concerning title to the remaining parcels described in Count II.
 
 
 8
 On March 13, 1970, the court granted receivers' motion to file a second amendment to the cross-complaint. Inter alia, this amendment added appellant Henry McGurren, both individually and as trustee, as a cross-defendant in Counts II and III.
 
 
 9
 From May 4 through May 8, and on May 21, 1970, hearings on the issue of title were conducted. Appellant Peerless participated, contending it was a bona fide purchaser from Washington Capital Corporation of a parcel with respect to which the receivers sought to impose a constructive trust. Appellant McGurren was present, but the attorney who represented McGurren was not. Both had notice.
 
 
 10
 On August 6, 1970, the district court entered its "Findings of Fact, Conclusions of Law, Memorandum, Order and Judgment,"[4] wherein a constructive trust was imposed upon all the properties listed in Count II, including those claimed by Peerless and Braewood. No judgment was entered against McGurren other than to require him to convey certain property. The court, however, in stating the basis upon which its relief was grounded, found that McGurren acted as a "conspirator" and "nominee" in the fraudulent scheme. McGurren, Braewood, and Peerless appealed.
 
 
 11
 II. Nature and Pattern of the Fraudulent Scheme.
 
 
 12
 City Savings fell into hopeless insolvency as a consequence of the fraudulent activity of its principal officers in concert with others. C. Oran Mensik, the president, chairman of the board, chairman of the executive committee and chief executive officer, apparently masterminded the scheme. Mensik was principally assisted by Robert M. Kramer, a vice-president of City Savings, a member of the executive committee, and a member of the board. Kramer's role was generally directed by Mensik and he often appeared as an officer in corporations controlled by Mensik.
 
 
 13
 While other persons had varying roles in the scheme, Mensik apparently preferred to manage a complex network of nominee corporations and their fraudulent transactions by himself. He was in custody after 1968 as a result of a conviction arising out of dealings in Maryland. His deposition was taken early in these proceedings. His present whereabouts are unknown. Consequently it has not been possible to obtain a wholly coherent picture of the scheme. Nevertheless, from the testimony, depositions and exhibits, one gains a fair understanding of both the pattern and the extent of the fraud.
 
 
 14
 With the assistance of the late attorney Alexander Pikiel, Mensik directed the creation of a large number of corporations. The ostensible officers and directors of these corporations would be elected or otherwise placed in their respective positions by Mensik and they, in turn, would respond to his direction and control. The controlling officers of City Savings, in accordance with Mensik's instructions, would then approve loans to these corporations secured by overvalued real estate. Indeed, the controlling officers along with other employees of City Savings often served as the nominal officers and directors of the corporations to which the loans were made.
 
 
 15
 While some of the money loaned might then be used to pay the purchase price of the land, the rest would be channelled to other Mensik-controlled corporations or partnerships, ostensibly for services rendered.
 
 
 16
 Frequently other Mensik-controlled corporations would acquire property from these nominees, the land being used as security for further inflated loans. And, because the amount of the loans usually far exceeded the fair market value of the property acquired, these corporations were sometimes able to acquire property without any encumbrances in favor of City Savings.
 
 
 17
 Beginning in 1959 and 1962 two land development projects in particular were used as a cover for depleting the assets of City Savings in this fashion: the Apple Orchard development in Bartlett, Illinois and the Howie-In-The-Hills project in Palatine, Illinois.
 
 
 18
 City Savings was seized by the state June 26, 1964 and turned over to liquidators September 20, 1964. The land development projects continued, some of the operations being carried out by nominee corporations among a rash of corporations first organized in 1964. Mensik remained active until imprisoned in late 1968. He aided in negotiation for loans made in 1966 by a Teamsters' pension fund.
 
 
 19
 The property claimed by Braewood, now known as Palatine Estates, is a portion of a tract acquired by Mensik-controlled Howie-In-The-Hills Building Corporation in 1962 and subdivided as Howie-In-The-Hills Unit 2. Braewood's claim is based on a deed dated March 1, 1966 from a later owner, Mensik-controlled Suburban Life Builders Corporation.
 
 
 20
 The property claimed by Peerless, usually referred to as the Mensik homesite, is a portion of a tract acquired by the Mensik group January 10, 1959. Title was taken in the name of Henry McGurren, trustee under a trust agreement dated January 10, 1959, as were other 1959 acquisitions. Although most of the tract was conveyed out by McGurren to a nominee corporation and subdivided, as were other tracts from time to time, the homesite continued until 1968 to be occupied by Mensik and was not subdivided. McGurren apparently continued to hold its title as trustee until he conveyed to Peerless in January, 1969. An interest which seems to have amounted to the beneficial interest in the homesite was transferred among Mensik nominees and to Washington Capital. Peerless' claim to the beneficial interest is based on a transaction with Washington Capital in May, 1967.
 
 
 21
 III. Jurisdiction.
 
 
 22
 Appellants have challenged the district court's subject matter jurisdiction over the proceedings. The district court considered its jurisdiction as ancillary to the principal action which occasioned the receivers' appointment. Appellants contend this was error and that facts constituting a basis for federal jurisdiction had to be pleaded in these actions before the court could take jurisdiction. We disagree.
 
 
 23
 The ancillary jurisdiction of federal courts over actions incident to a receivership established by a federal court has long been recognized.[5] So long as an action commenced by a court appointed receiver seeks "to accomplish the ends sought and directed by the suit in which the appointment was made, such action or suit is regarded as ancillary so far as the jurisdiction of the . . . court of the United States is concerned."[6]
 
 
 24
 Here, receivers were appointed by the court to marshal and preserve assets belonging to City Savings in order to create a fund from which the original plaintiffs and the intervening shareholders in the principal action might be reimbursed.[7] The instant actions were consonant with these goals. Accordingly, the district court could properly rely upon its ancillary jurisdiction and need not have an independent jurisdictional base. Accord, Esbitt v. Dutch-American, 335 F.2d 141, 142 (2d Cir., 1964).[8]
 
 
 25
 IV. Imposition of constructive trust on property held by
 
 
 26
 Mensik nominees.
 
 
 27
 Appellants Braewood and Peerless do not seriously challenge the findings that those through whom they claim ownership were instruments employed by Mensik and his associates in their scheme to convert to their own use the wealth contributed by the depositors of City Savings. They do argue that City Savings money was not traced directly into the properties they claim. Braewood relies on the fact that the public records indicate that any loan by City Savings secured by Howie Unit 2 had been repaid. Peerless relies on the fact, essentially, that although the funds used in the 1959 purchase of the tract which included the property claimed by Peerless were supplied by one or another Mensik nominee, they were not shown to have come directly from City Savings.
 
 
 28
 Such identification and tracing was not, however, the burden of the receivers in these circumstances. Mensik and his associates, through self dealing, violated their fiduciary duty to City Savings and made its assets the source of property virtually in their own hands, although held among the assets of other corporations organized for their own benefit. In a similar situation the Supreme Court of Illinois concluded that the bilked corporation did not have the burden of identifying and tracing its assets.
 
 
 29
 In Winger v. Chicago City Bank & Trust Co., 394 Ill. 94, 67 N.E.2d 265, 277 (1946), it was said:
 
 
 30
 "It is contended in this case, however, that there can be no recovery because there is no identification of the property obtained by the individual defendants, since it comes through the corporation defendant, the insurance company. In making this contention one very important principle is overlooked, viz.,-there is a duty resting upon trustees not to commingle their own property with that of the beneficiaries (White v. Sherman, 168 Ill. 589, 48 N.E. 128, 61 Am.St.Rep. 132), and when they do so commingle, in cases where the fiduciary relation exists and they have obtained the property by reason and because of the fiduciary relationship, the burden then rests upon the trustees to show by strong and convincing evidence, the property, or the part thereof that belonged to them before the commingling took place.
 
 
 31
 ******
 
 
 32
 * * *
 
 
 33
 "It is also a principle applying to the obtaining of property by a fiduciary that if it appears the property taken has been converted into a new form the beneficiaries have the right to elect whether to take such property as a substitute for the original property, improperly and illegally acquired by the trustees."
 
 
 34
 We have no difficulty in concluding that the properties claimed by appellants Braewood and Peerless were subject to a constructive trust in favor of City Savings when in the hands of appellants' predecessors. The real question on appeal is whether the district court's findings that appellants were also nominees or at least were not purchasers in good faith for value are clearly erroneous.
 
 
 35
 V. Claim of Braewood Building Corporation.
 
 
 36
 Braewood is a virtually one-man corporation, and for present purposes can be equated with its principal stockholder, Clark B. Frothingham. At the time of the hearings, at least, Henry McGurren was a director, the secretary, and owned ten per cent of the stock.
 
 
 37
 Braewood claims ownership of an eight acre parcel which was formerly Lot 12 of Block 32 of Howie Unit 2, but which Braewood resubdivided in 1966 into 22 lots known as Palatine Estates. Braewood received title by deed dated March 1, recorded April 7, 1966, from Suburban Life. The consideration for the deed was allegedly services rendered by Frothingham since April 1, 1965 and agreed to be rendered until the close of 1966. The documentary evidence and Frothingham's testimony leave considerable confusion as to the relevant agreements, the value and performance of the services, and the extent to which Frothingham received other payment.
 
 
 38
 Three payments were made to Frothingham in 1965 by Chicago Title and Trust out of a trust account in connection with a loan by a Teamsters pension fund. Each of these was for "project engineering and inspections" at Howie Unit 2, owned by Suburban Life. In each case an officer of Suburban Life signed a certificate that Frothingham was entitled to payment, and Frothingham signed a contractor's affidavit, and a waiver of lien.
 
 
 39
 On September 29, 1965 Frothingham swore that $4,400 was due for his work and that the labor necessary to complete his contract was $1,900. He was paid $4,400 September 30. He endorsed the check and it was then endorsed for deposit only by United Capital Company, a Mensik nominee. On December 9, 1965, he swore that $5,900 was due for his work and that the labor necessary to complete his contract was $400. He was paid $1,500 December 13, and endorsed the check, apparently to his own bank. On December 23, 1965 he swore that $6,900 was due for his work, and that no labor was necessary to complete, and Suburban acknowledged that there were extras of $600 in addition to the contract price of $6,300. Frothingham was paid $1,000 January 5, 1966, and again endorsed the check to his bank.
 
 
 40
 Frothingham produced a document dated February 23, 1966. It purported to be an agreement between Suburban Life by C. J. Melberg and Braewood by Frothingham. The agreement recited that in March 1965 Suburban Life had retained Braewood as coordinating engineer for installation of general improvements on land owned by Suburban Life; that Suburban Life had agreed to pay Braewood $750 per month for its services beginning April 1, 1965 and until December 31, 1966; and that Suburban Life "has not paid any of said funds agreed upon." Braewood agreed to continue to provide its services for the balance of 1966, and Suburban Life agreed to convey Lot 12 in full payment. Taking the agreement at face value, the property was to be conveyed for 21 months' services at $750 per month, or $15,750. Lot 12 had not then been resubdivided, nor had street, sewer, and water improvements been made, and there was no testimony as to its value in 1966. In 1969, however, contracts were made for sale of Palatine Estates for an aggregate of $54,000.
 
 
 41
 In early 1966 a plat for Palatine Estates was prepared, dated April 25, and recorded November 1. The deed from Suburban Life to Braewood was dated March 1 and recorded April 7, 1966.
 
 
 42
 Later in 1966, two payments were made to Frothingham by Chicago Title and Trust out of an escrow apparently in connection with a loan to Washington Capital. Each was for engineering services at Howie Unit 3, owned by Washington Capital. Frothingham's affidavits showed no details other than the amount sought, but the certificates signed by Mr. Finlay for Washington Capital, and receipted by Frothingham showed the following:
 
 
 43
 On July 6, 1966 Frothingham was entitled to payment of $18,000 to apply on a contract price of $21,000, leaving a balance due of $3,000. He was paid $18,000 July 20 and endorsed the check to Braewood's bank. On July 21 he issued a check on Braewood's account in the amount of $14,000 to United Capital. On August 16, 1966 Frothingham was entitled to payment of the $3,000 balance. He was paid $3,000 August 18, leaving no balance due. He endorsed the check to Braewood's bank.
 
 
 44
 Frothingham's testimony varied, seeming at times to be directed at serving one advantage, at times another. It would be to his advantage to have his services on Unit 3 included in the agreed consideration for the deed from Suburban life so that it would appear more adequate. On the other hand, if Unit 3 were not included, that might avoid the glaring inconsistency between being paid in cash for Unit 3 and claiming Palatine Estates as compensation for services. The purported February 23 agreement literally covered only land owned by Suburban Life and hence only Units 2 and 4, although the services he claimed to render on Unit 3 fell within the period of time covered by the agreement. The recitals in the agreement were inconsistent in any event with the payments previously made to Frothingham for services on Unit 2; if the agreement were intended to cover Unit 3, Frothingham's later representations that money was due for services on that unit were false. There was no persuasive explanation of Frothingham's turning over $18,400, which he testified was due to others for their services, to Mensik's nominee United Capital. This diversion of funds tends to show that he was subject to direction as a nominee.
 
 
 45
 McGurren appeared in the proceedings before the district court as Braewood's counsel, but was himself subject to an order to show cause as trustee. In McGurren's answer, August 27, 1969, he took the position that Braewood agreed early in 1965 to act as coordinating engineer at $750 per month for improvement of Units 2 and 4 and that it was later agreed that Braewood would receive Lot 12 as full payment. No reference was made to services on Unit 3.
 
 
 46
 Frothingham testified on deposition September 12, 1969. He told of a conversation with Carl Melberg in the spring or early summer of 1965 in which he consented to coordinate sewer, water, and excavation and fill improvements. Melberg said he represented Suburban Life, owner of Units 2 and 4, and Washington Capital, owner of Unit 3. Frothingham's next discussion was either in late 1965 or early 1966 when he was told they had money to start, and that the work was going to be done by Utopia as prime contractor. Frothingham met Kramer, of Utopia, in late 1965 or early 1966. He told Kramer Braewood would act as coordinating engineer.
 
 
 47
 He testified concerning the February 23, 1966 agreement with Suburban Life, and said he didn't recall a separate agreement with Washington Capital, but that he dealt with Melberg as managing agent of both. He admitted receiving payments from Chicago Title and Trust in connection with the work on Units 2, 3, and 4, but could not recall the amount received. "It was very small" and he did not credit Suburban Life. He said he "started putting in the time April 1, 1965," but described only vaguely the services performed before money was available for the work he was to coordinate. He testified he had "only the one agreement with Suburban Life" at $750 per month.
 
 
 48
 Further shifts in testimony occurred at the hearing September 29 and 30.
 
 
 49
 Frothingham began by admitting that he had received money from Chicago Title and Trust for services in Units 2, 3, and 4. He estimated the total amount "somewhere between $11,000 and $12,000." He was shown checks and lien waivers totalling $27,900. He then went back to the version contained in Mr. McGurren's answer, that Lot 12 was only compensation for services on Units 2 and 4. He explained that there was a second agreement for additional compensation for Unit 3. Units 2 and 4 were originally to be developed first and he expected there would be little work on Unit 3. Four to six months later there was a change in plans which required a great deal of work in Unit 3. As a result Utopia agreed to pay Braewood an additional $750 per month for Unit 3.
 
 
 50
 Frothingham also testified that, contrary to his representations at the time of obtaining payment, he was not entitled to the entire sums received from Chicago Title and Trust, but that some of it was due to other engineers. This was his explanation for turning over $4,400 Unit 2 money to United Capital through Suburban Life, and $14,000 Unit 3 money to United Capital. He testified to several payments he made to others and that out of the entire $27,900, he kept only $5,500.
 
 
 51
 Contrary to earlier testimony that he had only the one agreement, i. e., with Suburban Life, and contrary to later testimony that he had a second agreement with Utopia on Unit 3, he testified that his agreement on Unit 3 was directly with Washington Capital.
 
 
 52
 The district judge made it plain that he did not believe Frothingham. It has been held in Illinois that in a suit in equity the party claiming to be a bona fide purchaser for value must prove that he has actually paid for the property, and the recital in his deed is not sufficient proof. McGuire v. Gilbert, 270 Ill. 160, 110 N.E. 377, 380 (1915). It has also been held:
 
 
 53
 "Fraud is not presumed, but, when it is proved, one who claims title under a grantee whose title is fraudulent must show affirmatively that he purchased in good faith, without knowledge of the fraud, and for a valuable consideration." Koebel v. Doyle, 256 Ill. 610, 100 N.E. 154, 156 (1912).
 
 
 54
 See also, Lyon v. Moore, 259 Ill. 23, 102 N.E. 179, 181; Commercial Merchants' Nat. Bank & Trust Co. v. Kloth, 360 Ill. 294, 196 N.E. 214, 220 (1935).
 
 
 55
 Assuming that either is the applicable Illinois rule, it would be clear without going farther that the finding that Braewood was not a purchaser in good faith and for value was not clearly erroneous.
 
 
 56
 There are, however, other circumstances, and legitimate inferences therefrom, which tend to support the findings. Fraud may, of course, be proved by circumstantial evidence. Zurick v. Catavenis, 331 Ill. 240, 162 N.E. 869, 872 (1928). "Sometimes very slight circumstances, apparently trivial in themselves, when joined with other facts, may afford strong proof of fraud." Thornton v. Hendrickson, 213 Ill.App. 121 (1918). "State of mind, knowledge and intention often may be established by circumstantial evidence." Burnett v. Medford, 274 F.Supp. 845, 846 (E.D.Pa., 1967).
 
 
 57
 In certain respects Frothingham's behavior was not what would be expected from one who considered himself the beneficial owner. It is true that he claims to have paid the expenses of the resubdivision of Lot 12 into Palatine Estates. Street, sewer, and water improvements were not in. Utopia later provided them, but Frothingham did not "really remember" making a contract with Utopia about them, nor was he aware that Utopia had made a claim for them.
 
 
 58
 In February and March 1969, a series of instruments were recorded leading up to a transfer of ownership away from Braewood. According to Frothingham, he agreed to sell six lots to McGurren at $2,000 each. Although he said he needed cash, he accepted McGurren's note, due in one year. According to him he was willing to sell the other sixteen lots to a buyer Kramer had located without knowing the identity of the buyer or the selling price, provided that if the sale were made Braewood would receive $24,000, or $1,500 per lot. Actually Kramer had a buyer at $42,000 or $2,625 per lot. The transactions were interrupted by an injunction in these proceedings. They are summarized as follows:
 
 
 59
 The six lots.
 
 
 60
 A quitclaim deed was purportedly executed September 30, 1968 by Suburban Life, conveying the six lots to Braewood. Mensik signed as vice president and McGurren took his and the assistant secretary's acknowledgement. A quitclaim deed was purportedly executed September 30, 1968 by Washington Capital Corporation, conveying the six lots to Braewood. Kramer signed as vice president, and McGurren took his and the secretary's acknowledgment. A quitclaim deed was purportedly executed September 30, 1968 by Utopia Building Company, conveying the six lots to Braewood. Kramer signed as president and McGurren took his and the secretary's acknowledgements. These deeds were recorded March 11, 1969, with the direction that they be mailed to Braewood after recording. Frothingham testified he had no recollection of them. He testified that he sold the six lots to McGurren about the same time Kramer called him about selling the lots, and that was mid-December, 1968, some two months after the date of these three deeds. Why the deeds were executed at all and why they were held for eight months without recording, and perhaps without delivery, are mysteries.
 
 
 61
 A quitclaim deed was purportedly executed February 26, 1969 by Braewood, conveying the six lots to Joy A. Lutgert, who is McGurren's daughter. This deed was also recorded March 11, the date of McGurren's note for $12,000, payable to Braewood in one year.
 
 
 62
 The sixteen lots.
 
 
 63
 A quitclaim deed was purportedly executed October 21, 1968 by Braewood, conveying the sixteen lots to Janet Aniline of Midland, Michigan. Frothingham and his wife signed and McGurren took their acknowledgements. A warranty deed was purportedly executed November 28, 1968 by Janet Aniline and her husband, conveying the sixteen lots to McGurren as trustee under the provisions of a trust agreement.
 
 
 64
 Frothingham produced an agreement purportedly executed January 2, 1969 by Kramer and Braewood covering the sale through an escrow, and calling for either payment of $24,000 to Braewood or reconveyance of the lots by Kramer within 120 days. Some of the language in the agreement was not entirely consistent with the apparent fact that McGurren already had title to the sixteen lots as trustee.
 
 
 65
 Three instruments were recorded February 27, 1969. The first two were the Braewood-Aniline and the Aniline-McGurren deeds. The third was a release of a claim for lien filed by Utopia June 19, 1968. The release was dated February 25, signed by Kramer, and McGurren took the acknowledgement. The claim for lien referred to asserted that November 29, 1965 Utopia had made an agreement with Suburban Life to construct street, sewer and water improvements on the Palatine Estates resubdivision and had completed the work by December 5, 1966. Recorded just before the claim for lien were two other mystery documents, a purported option to Frothingham to purchase Lot 12 for resubdivision into Palatine Estates, purportedly executed on behalf of Suburban Life December 6, 1965, and a purported assignment of the option by Suburban to Utopia, dated January 11, 1968. Frothingham testified that he knew nothing of the claim for lien, nor of the option, except he indicated that an option, probably on more lots, had been discussed but never executed.
 
 
 66
 On February 27, 1969 McGurren executed a trustee's deed, conveying the sixteen lots to Margery Selvin, evidently an escrow agent. Amended Escrow Instructions to Chicago Title and Trust, dated February 26, 1969 stated that this deed would be deposited by McGurren. The instructions were signed by McGurren for the seller and Berman for the buyer and directed delivery of the deed to consummate a sale at $42,000. This was recorded March 11, 1969, the same day as the Braewood Lutgert deed of the six lots (along with other deeds relevant to the six lots).
 
 
 67
 Conceivably, a person might, in good faith, have performed valuable service, taken land for compensation, and decided to sell part of it to his attorney in return for a one year note, and to sell the balance to a former associate who might resell at a considerable profit to an unnamed purchaser. Cumulatively, however, the circumstances of all these dealings make the Frothingham version improbable.
 
 
 68
 Frothingham admitted that he knew Mensik at least socially, beginning in 1964, that he saw Mensik from time to time in the barn which was the Howie construction office, that during and after 1965 they talked about Howie, and he learned Mensik had an interest in Howie, and that he read what was in the papers about the claims of fraud at City Savings. It is understandable, under the circumstances, that Frothingham might want to minimize his direct involvement with Mensik since the case involves his dealings with persons and corporations which were instrumentalities in the Mensik fraud. On deposition Frothingham testified that Mensik was present at a conversation with Werer in 1965 and that he thought that it was Mensik who asked Werer to put Frothingham in touch with Melberg concerning the Howie development. At the hearings, Frothingham denied his earlier version and said he talked with Mensik after talking with Melberg.
 
 
 69
 Considering all Frothingham's testimony, we think the vagueness, contradictions, and disclaimers of information Frothingham must have had, at least if his claims were true, are themselves circumstances from which the court could infer that his claims were untrue and that he was endeavoring to conceal knowledge. See 2 Wigmore on Evidence, 3rd Ed. Sec. 278. Considering all the circumstances we think the findings were not clearly erroneous.
 
 
 70
 VI. Claim of Peerless Closure Co.
 
 
 71
 Peerless, although originally a manufacturing company, has come to be an investor for the benefit of the children of Henry A. Finlay, Jr. The stock is owned by trustees. Finlay manages all operations, and for the purpose of this case Peerless can be equated with Finlay. McGurren has had a long association with Finlay personally and with Peerless. He was initial registered agent for Peerless in 1948. He is presently registered agent, a director (since 1951), and secretary (since 1965). He was treasurer in 1964.
 
 
 72
 Peerless claims ownership of a seven acre parcel, improved with a substantial home, usually referred to as the Mensik homesite. Peerless received title by deed dated January 28, 1969, recorded January 31, from Henry McGurren as trustee. The homesite was part of a much larger tract acquired by Mensik interests in 1959. Title was taken in the name of Henry McGurren as trustee. The balance of the tract, and other land also conveyed to McGurren as trustee, was turned over from time to time to Mensik corporations for development. The homesite was not included in any subdivision. Peerless claims to have acquired the beneficial interest by assignment from Washington Capital about May 29, 1967, in return for $50,000 which Finlay testified he made available for the benefit of Peerless.
 
 
 73
 There is in evidence an assignment to Peerless of the beneficial interest in the January 10, 1959 trust agreement with McGurren and in property thereunder. The assignment was dated May 29, 1967 and executed on behalf of Washington Capital, by Kramer and the corporate secretary. Peerless executed an acceptance of the assignment, and McGurren, as trustee, signed a receipt for a duplicate. There was another assignment by Washington Capital to Peerless of a $300,000 note, which, as will be explained, has been treated as evidencing the beneficial interest in the homesite. This assignment was dated May 31, 1967. There was testimony that the transaction was really a secured loan, and to effectuate that, Peerless gave Washington Capital an option to buy the homesite for $60,000 in 90 days, $61,000 in 120, $62,000 in 150, and $63,000 in 180. There is in evidence an unsigned copy of an option with those terms, dated June 1.
 
 
 74
 There was testimony that Finlay turned over to McGurren, who acted as attorney for both parties, $50,000, then given to Washington Capital. Finlay produced a draft of the Canadian Imperial Bank of Commerce, at Nassau, drawn on the bank's New York Agency, dated May 26, 1967, and payable to Washington Capital in the amount of $50,000 U.S. It was purportedly endorsed for deposit by Washington Capital.
 
 
 75
 Finlay testified that American World Investment Association, Ltd., was a Bahamian corporation he had arranged to have organized in late 1966 or early 1967; that its purpose was to invest in Bahamian mortgages; that he invested his share of some debentures; that the loan to Washington Capital appeared a better opportunity than anything in the Bahamas then available; that some part of the $50,000 represented a loan to Finlay by the bank and some part funds of American World, but that he was not sure that he signed a note; that he thought American World would encounter difficulty in owning property in the United States, and therefore had Peerless carry out the transaction.
 
 
 76
 The draft does not identify the source of the funds. Finlay produced no records reflecting that American World had a bank account, that the bank charged American World for the draft, that Finlay or American World otherwise supplied funds to pay for the draft, that there was a loan by the bank to Finlay or American World, that there was a loan by American World to Peerless, or (except for the assignments, option, and draft) that Peerless made a loan to or purchased an asset from Washington Capital.
 
 
 77
 Finlay said he considered the transaction a "high-interest loan," but after Washington Capital failed for a long period to exercise its option, Peerless called on McGurren for a deed.
 
 
 78
 Again, as in the case of Braewood, the finding that Finlay, and hence Peerless, was not a purchaser in good faith for value and had at least constructive notice of the equities of City Savings by reason of the fraud practiced upon it, and the nominal character of the title of Washington Capital, rests upon circumstantial evidence.
 
 
 79
 Most important with respect to notice is Finlay's own role in Washington Capital from 1964 to 1966. Washington Capital was incorporated April 28, 1964, to supplant the Howie corporation. Its first president, De Vito, testified that Melberg told him he was going to be president, but would not have to do anything. Finlay became a director and secretary and treasurer in June, 1964 and president in the summer of 1965. The corporation reported to the secretary of state in 1966 that Finlay, his wife, and McGurren were directors, and Finlay was president and treasurer.
 
 
 80
 Finlay agreed to acquire 60% of the stock, but caution led him instead to make loans, secured by stock in Washington Capital and in a savings and loan association, stock of which was acquired with funds supplied by him. His loans totalled as much as $200,000 at one point.
 
 
 81
 During the summer of 1965, he demanded election as president, so as to "be able to look things over." Washington Capital was working to develop Unit 3 of Howie while he was president, and he appears to have signed the certifications dated July 6 and August 16, 1966 that Frothingham was entitled to payment for services. As set forth under Braewood, these certificates, if Frothingham were believed, would be fraudulent. Finlay admitted he was concerned about signing certificates for payouts when he was not satisfied the work had been done, and indicated there were other payouts he considered improper.
 
 
 82
 Mensik acted on behalf of Washington Capital in arranging a loan from the Teamsters pension fund. This occurred while Finlay was president.
 
 
 83
 United Capital, a Mensik corporation, bought stock in Washington Capital while Finlay was president, and Finlay lent money to United Capital and Fidelity Thrift, another Mensik corporation. Finlay also had dealings with Eastern Trust, a Bahamian corporation, and principal stockholder in a number of Mensik corporations. Henry McGurren, Finlay's friend and sometime attorney, and a director and officer of Peerless, controlled the bank account of Eastern Trust.
 
 
 84
 Finlay must have known of the transaction by which Washington Capital acquired the beneficial interest in the homesite, and presumably knew of the former ownership by Mensik corporations. On January 15, 1958 the Van Wagners, then title owners, signed a 15 year bearer note in the amount of $300,000, secured by a deed of trust of the homesite, and gave the deed of trust to Chicago Title and Trust, recorded January 27, 1958. McGurren, who had represented the Van Wagners, testified that these had been executed for anticipated financing, never carried out. The deed of trust was an apparent encumbrance on the homesite at the time the Van Wagners deeded their larger tract to McGurren in trust in 1959. Endorsements on the note show that Capital Mortgage (apparently the first Mensik owner) released the personal obligation of the Van Wagners January 5, 1959, and on October 10, 1962 transferred the note to Eastern Trust; that on June 30, 1965 Eastern Trust transferred the note to Washington Capital. At that date Finlay was a director and officer of Washington Capital and in actual control. He became president about that time, and the note and trust deed were turned over by him, and listed in a receipt, September 15, 1966 when he was severing ties with Washington Capital. When the note was assigned to Peerless in May, 1967, Finlay must have known that it had been passed among several Mensik corporations. Each endorsement specifies only "$10.00 and other good and valuable considerations."
 
 
 85
 Moreover, Finlay knew of at least questionable and probably fraudulent practices carried on by Washington Capital and related companies.
 
 
 86
 Finlay testified that he delivered possession of the stock in Washington Capital to Mensik in exchange for payment of all his loans to Washington Capital. The receipt for the stock, signed by Mensik September 30, 1966, recites no consideration although both testified that payment to Finlay occurred at the time and effected settlement of a lawsuit begun by Finlay.
 
 
 87
 Finlay admitted learning, before the Peerless-homesite transaction, that Mensik had been indicted in Maryland.
 
 
 88
 A further significant circumstance is that the proof of the source of the $50,000 Canadian bank draft in May, 1967 was unsatisfactory. When Finlay had previously made loans, there seemed to be no difficulty in his or his wife's writing personal checks for substantial amounts, the highest being $97,000. On the occasion of the homesite transaction, however, Finlay claimed to have flown to Nassau to obtain the bank draft. As already pointed out, no other documentary evidence was produced, although the several intercorporate transactions could be expected to generate record entries.
 
 
 89
 Finlay's alleged Bahamian American World Investment Association, Ltd. had the same officers as Eastern Trust, American Fidelity Insurance Company, and American Reserve Insurance Company. McGurren knew these officers and had had control of the accounts of these companies at the same Canadian bank, as well as of the accounts in the name of International Guaranty & Insurance Company, American Surety Co., Ltd., Universal Fidelity & Insurance Co., American World Savings Association, Ltd., and Metropolitan Thrift Co., Ltd. At least in the case of Eastern Trust, McGurren's control was exercised as late as July, 1966. If he had control of money in these accounts in May, 1967, such money could well have been the source of the May 26 bank draft. There are no records in evidence inconsistent with that possibility. Finlay testified that McGurren went with him to Nassau and helped him set up American World Investment.
 
 
 90
 In 1967, when the beneficial interest was assigned to Peerless, Mensik was living in the homesite and he continued there until late 1968. A lease had apparently been executed by McGurren as trustee and lessor and Mensik as lessee. It was dated March 1, 1963, to expire February 28, 1968. The agreed rental was $500 per month, but he paid no rent to Peerless and the record does not indicate that he ever paid. These facts would also put Finlay on inquiry.
 
 
 91
 A further significant circumstance is the apparent inadequacy of the value allegedly paid for the homesite. The market value in 1967 was not directly established, but it is clear that it was a substantial asset. Finlay testified he had made an agreement, apparently in 1969, to sell it for $75,000. He referred to this as a distress price, apparently because of litigation. He testified in 1970 that Van Wagner spent $96,000 on it in 1952 or 1953 and that the land should be worth $8,000 or $9,000 per acre on the current market. Taking the building at cost, which Finlay implied was an appropriate approach, and seven acres at $9,000, the value would be $159,000. Inadequacy of price is a circumstance to be considered. Redmon v. Borah, 382 Ill. 610, 48 N.E.2d 355, 358 (1943); McDonnell v. Holden, 352 Ill. 362, 185 N.E. 572, 574 (1933).
 
 
 92
 A further significant circumstance is the evasive and at times incredible character of Finlay's testimony.
 
 
 93
 Finlay was often evasive when questioned about American World Investment Association. He did not remember who gave him the names of the people who became the "rubber stamp" officers, although the record strongly suggests it must have been McGurren. At the time of the hearing the corporate books were in the Bahamas, but Finlay didn't know who had them. He did not know whether he signed a note for the loan which provided part of the $50,000 draft, or whether the bank merely permitted an overdraft.
 
 
 94
 Finlay could not recall if he was ever the president of the savings and loan association acquired by Washington Capital with Finlay's money. He could not recall any shareholder of Washington Capital, or who voted its stock. Although Finlay purchased 3,000 shares of stock in the savings and loan association, he was unable to recall from whom he purchased it.
 
 
 95
 At a deposition in November, 1969, Finlay denied knowledge of Eastern Trust. At a deposition of McGurren, March 17, 1970, McGurren was confronted with evidence of a Finlay check payable to Eastern Trust. At a deposition two days later, Finlay produced his check, dated July 8, 1966, for $27,500, payable to Eastern Trust. He explained that the check was to pay for a Bahamian mortgage which did not materialize, and that Eastern Trust returned the money in seven instalments, September 6, 1966 to April 3, 1967.
 
 
 96
 The evasions and implausibilities of several portions of his testimony permit the inference that he wished to conceal the true character of the transactions. See Wigmore on Evidence, 3rd ed. Sec. 278.
 
 
 97
 Considering all the circumstances, we think the findings with respect to Finlay and Peerless were not clearly erroneous.
 
 
 98
 Peerless argues that even if a constructive trust be appropriate, equity requires that the $50,000 and expenses of maintenance should first be restored to it as one acting in good faith. We are neither sufficiently persuaded of the source of the $50,000, nor of Finlay's good faith, to invoke this doctrine. Braewood makes a similar argument, but similar reasons stand in its way.
 
 
 99
 VII. The role of Henry McGurren.
 
 
 100
 The district court found that Henry McGurren held title to various Apple Orchard and Howie properties as nominee for Mensik, that conveyances of these parcels were "engineered" by McGurren, along with Mensik and Kramer, in order to disguise their true ownership, that McGurren assisted Mensik in funnelling City Savings funds to foreign based nominees, American Fidelity Insurance Company, Ltd., and American Reserve Insurance Company, Ltd., and ultimately that "McGurren acted as a conspirator with and nominee for Mensik."
 
 
 101
 For the purposes of the appeal of Braewood and Peerless we are concerned with these findings and the evidence which supports them only to the extent that they tend to support the findings and judgment with respect to Braewood and Peerless. To that extent the inquiry would have been appropriate whether McGurren was a party to the proceeding or not.
 
 
 102
 McGurren appears not to have been directly involved with Braewood at the time of the 1966 transactions which are fundamental to its claim, although by the time of the hearing he had become a director and officer of Braewood, as well as attorney, and held title as trustee to some of the property claimed by Braewood.
 
 
 103
 The extent of his knowledge of Mensik's scheme is more significant in supporting the findings as to Peerless, for he was directly involved in the transaction between Washington Capital and Peerless at the time of their transaction in 1967. He then held title to the land as trustee, was lessor in the lease to Mensik, acted as attorney for both parties, was registered agent, a director, and an officer of Peerless, and participated in the alleged incorporation of Finlay's Bahamian company.
 
 
 104
 McGurren's activity with Mensik nominees, disclosed by the record, spanned from 1959 to the time the proceeding concerning title began in 1969. He appeared in many transactions as trustee, notary, attorney for one party or another, registered agent, or corporate officer.
 
 
 105
 Conceivably any of the functions shown to have been performed by McGurren could be performed without acquiring knowledge of the Mensik fraud, but as he is shown to have been active in more capacities and over a longer time, it becomes unreal to deem him a mere scrivener, trustee, notary, and attorney, without understanding of the purposes his acts were serving.
 
 
 106
 In 1959 McGurren was involved as attorney for the sellers and as land trustee after the sale, in the acquisition of large tracts which he later conveyed out to Mensik corporations and which formed the Apple Orchard subdivisions. In one of these transactions, City Savings was the remitter on checks made payable to McGurren and endorsed by him to the sellers.
 
 
 107
 A series of transactions is illustrative of his continued relationship to Mensik nominees:
 
 
 108
 On January 3, 1962, McGurren, as trustee, conveyed ten parcels to Riehl, secretary for and frequent nominee of Mensik. On January 4, Riehl conveyed to La Salle National Bank, as trustee, in trust No. 29042. McGurren was beneficial owner under the trust agreement. At his direction, the bank separately deeded each parcel to Chicago Title and Trust, each to secure a bearer note. McGurren directed the bank to return all documents to Attorney Pikiel (a Mensik functionary), and after recording, they, as well as the McGurren and Riehl deeds, were so returned. Pikiel took the acknowledgements of McGurren and Riehl. On November 16, 1964, after the closing of City Savings, McGurren directed the bank to convey the ten parcels, subject to the earlier trust deeds, to United Capital, a Mensik nominee, which had been incorporated March 5, 1964.
 
 
 109
 McGurren served as American counsel for Eastern Trust, American Fidelity, and American Reserve. These were Bahamian companies. Eastern Trust held all or a majority of stock in domestic corporations utilized in Mensik's scheme. Mensik voted Eastern Trust's stock to elect directors who would act in his behalf. City Savings paid over $1,000,000 to American Fidelity and American Reserve ostensibly as premiums for insurance of mortgages. It does not appear that insurance protection was actually afforded. Although McGurren insisted on being described as attorney for these entities, his services went beyond the traditional role of attorney. McGurren had authority to deposit and withdraw funds of all three companies, in the Canadian Imperial Bank of Commerce. His authority as to the first two was exclusive. As to Eastern Trust he testified it may not have been exclusive.
 
 
 110
 As in the instances of Frothingham and Finlay, the evasive, misleading, and implausible character of McGurren's testimony reached the point of being substantive evidence that facts were contrary to the attempted explanation. See Wigmore on Evidence, 3rd ed. Sec. 278. Much of his testimony involved denial of or inability to recollect transactions or associations until confronted with documentary evidence.
 
 
 111
 When first questioned about Eastern Trust, McGurren could not recall whether he had the authority to deposit and withdraw its funds at the Canadian Imperial Bank of Commerce. When confronted with his own office correspondence, he recalled that he had such authority and that either he or his secretary traveled from Chicago to Toronto to pick up canceled checks and statements of Eastern Trust.
 
 
 112
 He could not recall any transactions with Finlay in connection with these companies until confronted with a letter forwarding Finlay's check for deposit in Eastern Trust's account.
 
 
 113
 McGurren initially testified that he had nothing to do with Howie. After being shown a deed of trust of Howie Unit 3, securing a $1,400,000 note, on which he had taken Finlay's acknowledgement as president of Washington Capital, and which bore the direction to return to him after recording, he stated it "must have been the Union loan where I acted as attorney in the escrow, but I have no independent recollection of it." He made a similar answer when shown a mortgage of Unit 4, March 1, 1966, Suburban Life, mortgagor, securing $444,100, and bearing the direction to return to him.
 
 
 114
 McGurren could not recall how he became registered agent of Fidelity Thrift, nor any dealings with it, although a release of Apple Orchard property in favor of Fidelity Thrift bore a direction to return to him.
 
 
 115
 In 1969 when Peerless directed conveyance to it of the homesite, McGurren testified that he erroneously believed Peerless was entitled to four additional lots and "caused" La Salle National Bank, trustee, to convey them to Peerless. McGurren could not name the beneficial owners under this trust, although he claimed he obtained a written direction from such owner directing the bank to convey.
 
 
 116
 One tract was acquired from a Mrs. Baker, apparently for a Mensik corporation, either A-1 Construction or Capital Mortgage. It became part of the Apple Orchard. McGurren testified that he represented the purchaser and used funds provided by the purchaser. He denied using Canadian banking connections to obtain the purchase money. At a deposition, when shown that on February 14, 1963 he requested the Canadian bank to issue him a check for $66,737.86, charged to the account of American Fidelity, and that he endorsed the check to Mrs. Baker, McGurren continued to deny recollection.
 
 
 117
 During the hearing, McGurren testified that after the deposition he happened to encounter one of the investors in American Fidelity, a Moroccan by the name of Mosey (or Mazey) Nahon and that Nahon said that American Fidelity originally intended to buy the tract, but after the check was issued, agreed to take stock in the company which bought the property, but never got the stock. There was no explanation of why the matter was left in that status. McGurren was unable to recall who held the beneficial interest in the trust to which Mrs. Baker conveyed.
 
 
 118
 Another illustration of incredible testimony is McGurren's explanation that he had destroyed all documents related to his representation of American Fidelity, American Reserve, and Eastern Trust. He said these were destroyed when he moved his office in June, 1965. His correspondence shows, however, that he transacted business for these companies from his new office as much as a year after his move.
 
 
 119
 We conclude that the findings that McGurren was a knowing participant in the Mensik scheme are not clearly erroneous. They in turn tend to support the findings at least as to the Peerless property.
 
 
 120
 VIII. McGurren's appeal.
 
 
 121
 The judgment entered August 6, 1970 (1) imposed a constructive trust upon specified parcels of real estate, (2) vested title in City Savings free of all claims of specified cross-defendants, (3) declared conveyances of these parcels from McGurren as trustee under the January 10, 1959 trust agreement constituted a fraud and were void, and (4) ordered McGurren and others to convey certain of these parcels to City Savings. Other than the order to convey in (4), the judgment granted no relief against McGurren. The scope of the judgment was consistent with the underlying notice of the motion for a hearing "on the issue of title to the properties described in Count II of the Second Cross Complaint" of City Savings.[9]
 
 
 122
 On appeal McGurren argued (1) that the district court did not have jurisdiction of the subject matter; (2) that, in substance, the notice was an insufficient predicate for inquiry into and findings bearing upon knowing participation by McGurren in the Mensik scheme; and (3) that these findings lack support, are clearly erroneous, and exceed the scope of the notice. He does not ask reversal so as to restore title to any parcel, but "that the order of the trial court be reversed and the cause dismissed as to him, or, in the alternative, that the findings of conspiracy as to McGurren and other findings with reference to him, be reversed, [ordered] deleted, and expunged."
 
 
 123
 His brief also states that he "is not concerned with the question of title to the property, and has already quitclaimed his interest as Trustee to the Receivers, pursuant to Court order, and pursuant to a stipulation with the receivers that such action in no way constitutes a waiver of any right to contest on this appeal any findings of fact or conclusions of law."
 
 
 124
 Presumably Mr. McGurren had a sufficient apparent interest in his capacity as trustee to appeal from the judgment in order to seek reversal in order to recover title for the benefit of those for whom he was trustee. He has not, however, attacked any part of the judgment, but is concerned only with findings of the court characterizing his activity, and with whether those findings will be binding on him when the receivers' claim of his personal liability comes on for trial.
 
 
 125
 This court, however, has no jurisdiction to review findings, or such matters as the sufficiency of notice, except as an incident to a proper appeal from the judgment entered in the proceeding where such finding was made or such procedures taken, and Mr. McGurren has made no challenge to the judgment itself. We conclude that under the circumstances he has no standing to seek review of the findings nor a declaration that they went beyond the scope of the notice. We express no opinion on the extent to which the findings may affect the later determination of other claims against him. We have treated with the findings as to his role only to the extent they support the findings and judgment with respect to Peerless.
 
 
 126
 On the appeals of Braewood and Peerless the judgment is affirmed. The appeal of McGurren is dismissed.[10]
 
 
 
 [1]
 See Mensik v. Smith, 18 Ill.2d 572, 166 N.E. 2d 265 (1960); Tcherepnin v. Franz, 277 F.Supp. 472 (N.D.Ill., 1966); Tcherepnin v. Knight, 371 F.2d 374 (7th Cir., 1967), rev'd 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); Tcherepnin v. Kirby, 416 F.2d 594 (7th Cir., 1969); Tcherepnin v. Franz, 316 F.Supp. 714 (N.D.Ill., 1970) (the subject of the present appeals); Tcherepnin v. Franz, 461 F.2d 544 (7th Cir., 1972); Tcherepnin v. Campbell, 469 F.2d 531 (7th Cir., 1972); Tcherepnin v. Franz (N.D.Ill., March 12, 1973)
 
 
 [2]
 Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)
 
 
 [3]
 This action was affirmed by our court in Tcherepnin v. Kirby, 416 F.2d 594 (7th Cir., 1969)
 
 
 [4]
 Tcherepnin v. Franz, 316 F.Supp. 714 (N.D.Ill., 1970)
 
 
 [5]
 White v. Ewing, 159 U.S. 36, 15 S.Ct. 1018, 40 L.Ed. 67 (1895); Pope v. Louisville, New Albany & Chicago Ry. Co., 173 U.S. 573, 19 S.Ct. 500, 43 L.Ed. 814 (1899); Riehle v. Margolies, 279 U.S. 218, 223, 49 S.Ct. 310, 73 L.Ed. 669 (1929); Rheinberger v. Security Life Ins. Co. of America, 146 F.2d 680, 682 (7th Cir., 1944). See generally, 7 Moore's Federal Practice p 66.07 at 1938-1939
 
 
 [6]
 Pope, supra, note 5, 173 U.S. at 577, 19 S.Ct. at 501
 
 
 [7]
 Tcherepnin v. Kirby, 416 F.2d 594, 597 (7th Cir., 1969)
 
 
 [8]
 In an attempt to bolster their jurisdictional claim, appellants argue that the cross-complaint by which these parties were joined did not comply with Rule 13(g), F.R.Civ.P. This claim does not go to subject matter jurisdiction. It appears to have been raised for the first time on appeal, and assuming it would have any merit as a challenge to jurisdiction over the person, or to matters of form of the proceedings, it appears to have been waived. We think, however, that in any event the court has considerable discretion as to the form of the proceeding through which it exercises its jurisdiction over the receivership and its jurisdiction ancillary thereto
 
 
 [9]
 The judgment disposed of only a portion of the action and contained the recitations required by Rule 54(b), F.R.Civ.P., so as to make it, nevertheless, final and appealable
 
 
 [10]
 On petition for rehearing, Mr. McGurren relied on an order entered early in the course of the appeal. The receivers moved to dismiss the McGurren appeal, a response was filed, and on July 23, 1971 the motion was denied without discussion. We have again reviewed the matter and are satisfied that our present decision to dismiss is correct. The order of July 23, 1971 was entered by a single judge, was subject to review under Rule 27 (c), F.R.App.P., and we have vacated it