## SECURITIES AND EXCHANGE COMMISSION

v.

## Deborah Rosen ANTAR, Simone Antar, Nicole Antar, Danielle Antar, Gabrielle Antar, and Noelle Antar.

### Civ. A. No. 89–3773 (NHP).

United States District Court,
D. New Jersey.

Aug. 23, 1993.

---

el Felder, New York City, for nominal defendants.

A. Richard Ross, Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, Roseland, NJ, for trustee/receiver Charles C. Carella.

John D. Arseneault, Arseneault, Donohue, Sorrentino & Fassett, Chatham, NJ, for Eddie Antar.

Marvin Gersten, David W. O'Connor, Gersten, Savage, Kaplowitz & Curtin, New York City, for Mitchell Antar.

Michael Chertoff, U.S. Atty., Dept. of Justice, Newark, NJ.

POLITAN, District Judge.

### BACKGROUND

Before the Court is another chapter in the saga of the Antar family. The naked question in this case is whether a person who has violated the securities laws can shield the ill-gotten gains from recoupment by causing those profits to occur in a trust for his children.

The naked facts are living proof of the old adage, which unfortunately is the all too frequent credo in today's world: "let the ends justify the means". Placing Deborah Rosen Antar's testimony in the matrimonial action in juxtaposition to her testimony in this case, dramatically demonstrates that "truth" depends upon what result is sought. A sorry commentary. The real truth, however, compels rejection of her latest version of the facts placed before this Court to support her assertion that the ill-gotten gains should not be recouped. This Court will not be fooled by tears, nor misled by the obvious appeal to its sensitivity for children. The ends can never justify the means. This Court in no uncertain terms rejects this ill-conceived evil principle. Let the truth be told and judged whatever the result. The law demands no more and no less than that.

This case involves a claim by the United States Securities and Exchange Commission ("SEC") for constructive trust and unjust enrichment in connection with approximately $8,000,000 (Eight Million Dollars) that was obtained through the sale of 300,000 shares of the common stock of Crazy Eddie, Inc.

Richard E. Simpson, Richard G. Wallace, S.E.C., Washington, DC, for plaintiff.

Stephen L. Dreyfuss, Matthew E. Moloshok, Hellring, Lindeman, Goldstein & Siegal, Newark, NJ, Myrna Felder, Raoul Lion-

("Crazy Eddie") on June 28, 1985. The 300,-000 shares will be referred to herein as the "custodial stock." The defendants in this case are Deborah Rosen Antar ("Deborah"), the former wife of Eddie Antar ("Eddie"), and the five children of Deborah and Eddie Antar named Danielle Antar, now deceased, Simone Antar, Nicole Antar, Gabrielle Antar, and Noelle Antar. The children's ages at the time of the sale of their shares on June 28, 1985 were as follows: Danielle, age 10, Simone, age 11; Nicole, age 11; Gabrielle, age 7; and Noelle, age 6. The defendants will be referred to herein as the "nominal defendants." The SEC has alleged no violations of federal securities law against Deborah Rosen Antar or the children.

The custodial stock was purportedly held by Deborah Antar as custodian for her five children. The stock originated from purported gifts to the children that were made by Eddie Antar in December 1983 and January 1984 under the New York Uniform Gifts to Minors Act. For reasons expressed in this opinion, the Court finds that the adjudication of the SEC's case against the nominal defendants does not require a determination of whether Eddie Antar's purported gift was legally effective or whether Deborah Antar actually held title to the custodial stock as custodian for her five children.

The SEC initiated this action in 1989, asserting claims against only former officers, directors or executive employees of Crazy Eddie, Inc.: Eddie Antar, Sam E. Antar, Mitchell Antar, Isaac Kairey, David Panoff, Eddie Gindi and Kathleen Morin. The SEC's original complaint sought injunctive relief against each of the defendants as a violator of the Securities Act of 1933 or the Securities Exchange Act of 1934, and the additional remedy of disgorgement of profits derived by each such violator.

On or about April 9, 1990, the SEC filed an Amended Complaint to join Deborah Rosen Antar and her children as nominal defendants. In the Amended Complaint, the SEC alleged that Eddie Antar caused the sale of the custodial stock. The SEC alleged that Eddie did so at a time when he knew or was reckless in not knowing that the market price of the stock was based on materially false representations regarding Crazy Eddie's financial condition. The SEC alleged that Eddie was the person who made the decision to sell the custodial stock. The SEC also alleged that Eddie's sale of the stock violated section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a), section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10b–5.

The SEC alleges that the nominal defendants are constructive trustees with respect to the illegal profits derived from the sale of the custodial stock. According to the SEC, the nominal defendants hold the illegal profits under circumstances in which it is unjust or inequitable for them to retain the funds. The SEC also maintains that the nominal defendants are unjustly enriched by the illegal profits.

The SEC asks this Court to impose a constructive trust on the illegal profits held by the nominal defendants and to order the nominal defendants "to account for and disgorge all profits and monies received as a result of the illegal conduct of Eddie Antar in connection with the sale" of the custodial stock.

The nominal defendants have denied that the SEC is entitled to any recovery as against them, and have asserted as defenses, *inter alia,* that the SEC failed to state a claim, that Eddie Antar was never custodian of their shares, that Eddie Antar had no beneficial interest in their shares, that Deborah Rosen Antar as sole custodian made the decision to sell the children's shares, that the nominal defendants were innocent of wrongdoing, that the nominal defendants had received no illegal profit, that the nominal defendants had no fiduciary duties to Crazy Eddie, Inc. or its shareholders, that the SEC's claims are barred by the applicable statute of limitations, and that the Court lacks subject matter jurisdiction.

The SEC moved for summary judgment against the nominal defendants, and the nominal defendants cross-moved for summary judgment dismissing the Amended Complaint as against them. The motion and cross-motion were argued on October 28,

1991. In support of their motions, the parties submitted affidavits, documentary evidence and, in the case of the SEC, transcripts of testimony given by Deborah Antar. This Court found at the hearing that the only disputed factual issue was the question of who sold the custodial stock. Citing *Securities and Exchange Commission v. Cherif,* 933 F.2d 403 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 966, 117 L.Ed.2d 131 (1992), the nominal defendants posit that the issue of "who sold the stock" is immaterial as a matter of law. The SEC disagrees and maintains that there is no genuine issue regarding who sold the stock.

To facilitate resolution of the motion and the determination of the claims and defenses, this Court directed an evidentiary hearing solely on the issue of "who sold the stock." The issues of law that the parties raised in their motions were taken under advisement.

This Court held a trial on November 21 and 22, 1991 on the issue of who sold the custodial stock. *See* Transcript of Proceedings, *Securities and Exchange Commission v. Deborah Rosen Antar, et al.,* Civil No. 89–3773 (D.N.J. November 21 and 22, 1991) ("Tr."). At trial, five witnesses testified resulting in a trial transcript of 262 pages. The witnesses were: Myrna Felder, attorney for Deborah in *Deborah Antar v. Eddie Antar,* Index No. 06755/88 (N.Y.Sup.Ct. Kings Co.); Deborah Rosen Antar; Robert S. Rosenbaum, President of R.S. Rosenbaum & Company, the firm that printed the June 28, 1985 Proxy Statement of Crazy Eddie, Inc.; Theresa Miselis, keeper of the records of Bank Leumi Trust Company of New York; and Lillian Rosen, the mother of Deborah Antar.

In addition to the testimony of the five witnesses who appeared at trial, portions of testimony that Deborah gave at deposition and trial in *Deborah Antar v. Eddie Antar,* at deposition in *Deborah Antar v. Eddie Antar and Solomon Antar,* Index No. 15910/87 (N.Y.Sup.Ct.N.Y.Co.), and at deposition in this case, were offered into evidence. The two actions above that Deborah brought against Eddie Antar and/or Solomon Antar are referred to herein as the "matrimonial case." Furthermore, sworn affidavits that

Deborah submitted in this case and in the matrimonial case were received in evidence. The Court also admitted into evidence portions of deposition testimony that Lillian Rosen gave in the matrimonial case, and the entire transcript of deposition testimony that Ted Serure gave in this case. Ted Serure was the broker who executed the sale of the custodial stock.

The following exhibits were received into evidence at trial: SEC Exhibits ("Px") 1 through 17, 20 through 24, and 42 through 48; Nominal Defendants' Exhibits ("Dx") 1 through 31. These exhibits included public documents from the matrimonial case and documents from the files of Crazy Eddie, Bank Leumi Trust Company of New York, the SEC, R.S. Rosenbaum & Company, and Bear, Stearns & Company. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### EDDIE ANTAR SOLD THE CUSTODIAL STOCK

Based on the evidence that was presented at the trial held on November 21 and 22, 1991, the Court hereby finds that Eddie Antar was the person who sold the custodial stock on June 28, 1985. The reasons for the Court's finding are set forth below.

*Deborah Antar's Prior Sworn Statements Establish That Eddie Was The Person Who Decided To Sell The Stock*

In the matrimonial case, Deborah unequivocally identified Eddie as the person who decided to sell the custodial stock. In her September 21, 1987 and October 2, 1987 affidavits, Px1 and Px2, Deborah recounted how Eddie told her that he was selling the stock:

> Nor was I ever aware that I had any power over our daughters' stock. In the summer of 1985, Eddie *told* me that *he* was selling our children's stock so that their future could be assured. He *told* me that Teddy Serure would be calling me and I was merely to say okay. I did follow those orders, but it was not I who made that

decision nor did I even know that I could control that stock. ·

Px 1, ¶ 38; Px 2 ¶ 43 (emphasis in original). At the trial in this case, Deborah admitted that all of these statements are true. Trial Transcript ("Tr.") at 119–21.

In the September 21, 1987 affidavit filed in the matrimonial case, Deborah stated under oath: "The facts of the matter are ... I never independently acted as the custodian for our children's shares of stock—I merely followed Eddie's orders, as always." Px 1, ¶ 47(i). At trial in the present case, Deborah admitted that this statement is true. Tr. at 121–22.

More than a year after her affidavits, Deborah gave deposition testimony in the matrimonial case. Px 4. In that testimony, she stated that she did not sell the custodial stock, but was told to sell it:

Q. Did you sell 300,000 shares of stock as custodian for your children, June of '85?

A. No.

Q. You did not?

A. As co-custodian I was told to sell it.

Px 4 at 1530. At trial in the present case, Deborah admitted that this testimony is true. Tr. at 128–29.

At her deposition in the matrimonial case, Deborah stated that her only participation in the sale of the custodial stock was "saying yes on the phone." Px 4 at 1531. She also testified as follows: "I didn't do anything. I was told to say yes to Teddy [Serure] on the phone. Nothing more." Px 4 at 1533–34.

After the matrimonial trial in June and November 1989, Deborah continued to maintain that Eddie was the person who sold the custodial stock. In her post-trial reply memorandum, Deborah stated through counsel: "Plaintiff believes that Mr. [Ted] Serrure's [sic] testimony shows the heavy hand of Eddie Antar throughout ... the sale of the children's stock on June 1985 at $27 a share." Px 5 at 44.

*Deborah's "Explanations" For Her Sworn Statements Are Not Credible*

In this case, Deborah has sought to "explain" her statements in an effort to show that she was the person who decided to sell the custodial stock. For the reasons stated below, the Court finds that Deborah's "explanations" are not credible.

At trial in the present case, Deborah said that her prior affidavits do not tell the "whole story." Tr. at 119. However, she offered no reason for her failure to tell what she now says is the whole story. When asked if there was any reason, Deborah responded: "No. I don't know of any reason." Tr. at 120.

At trial, Deborah said that paragraph 47(i) of her September 21, 1987 affidavit, Px1, was a true statement "[a]s part of the picture." Tr. at 122. Paragraph 47(i) is the statement that reads: "I never independently acted as the custodian for our children's shares of stock—I merely followed Eddie's orders, as always." Px 1 ¶ 47(i). Deborah indicated at trial that the paragraph did not include "the other parts of the picture." Tr. at 122–23.

In response to the Court's inquiry, Deborah could not point to an affidavit of hers in the matrimonial proceedings that would support what she now says is the "whole story":

BY THE COURT:

Q. Mrs. Antar, the only place—let's get to the nub of it. The only difference, you say, between your position today and what is contained in that affidavit [Px 2, ¶ 43] is you say you were badgering [Eddie] to sell the stock prior to its being sold; is that correct?

A. Correct.

Q. Okay. Is there anything, to your knowledge, in any of the affidavits that you signed in your matrimonial proceedings which would support that assertion, to your knowledge?

A. I don't remember any. I don't know.

Tr. at 127.

At the close of her examination, Deborah could not point to any instance in the matrimonial case where she testified that the sale of the custodial stock was the result of her badgering Eddie. Tr. at 137.

On at least four occasions in the matrimonial case, the sale of the custodial stock was directly addressed by Deborah or her coun-

sel. Px 1, ¶ 38; Px 2, ¶ 43; Px 4 at 1530–34; Px 5 at 44. Counsel for the nominal defendants have not identified *any* instance in the matrimonial case where Deborah related the badgering story that she has proffered in this action.

It was not until a declaration submitted to this Court on March 26, 1990 that Deborah swore that she demanded of Eddie that the custodial stock be sold. Px 24 ¶¶ 7–11. That declaration was submitted four days after the SEC had announced, in the presence of Deborah's counsel, that its attempted recovery of the custodial funds would be premised on the question of who made the determination to sell the stock. 3/22/90 Hearing Tr. at 16–17.

At a deposition of an SEC attorney on the very morning of Deborah's March 26, 1990 declaration, counsel for the nominal defendants was specifically told that the SEC had information

that the [custodial] shares were sold by Eddie Antar. Eddie Antar made the trading decision. It was Eddie Antar that was well aware that Crazy Eddie's financial condition had been materially misstated in certain publications since it was Eddie Antar, himself, who directed the misstatements.

3/26/90 Barbara Katron Dep. at 95.

As of March 26, 1990, the nominal defendants were well aware that both the SEC and the trustee/receiver in this action were claiming that the custodial funds were the product of a trading decision made by Eddie Antar on the basis of inside information. The obvious purpose of Deborah's declaration was to offer "proof" in this case that Deborah rather than Eddie was the person who sold the custodial stock.

*The Evidence Supports Deborah's Sworn Statements That Eddie Was The Person Who Sold The Custodial Stock*

The Court finds that the circumstances surrounding the sale support Deborah's earlier statements that Eddie was the person who decided to sell the custodial stock. The evidence shows Eddie Antar's "heavy hand," as Eddie unilaterally implemented his decision

to sell and thereafter took sole control over the proceeds.

Eddie caused Ted Serure, his stock broker and close friend, to execute the sale of the custodial stock. Px 4 at 1531; Tr. at 88–90. Deborah, on the other hand, did not know which brokerage house sold the custodial stock, Tr. at 130, "didn't care" who handled the sale, Tr. at 90, and did not know that Serure was a stock broker. Tr. at 88.

Deborah did not sign any documents to sell the custodial stock. Tr. at 94. Lillian Rosen, Deborah's mother, signed Deborah's name to the Rule 144K letters necessary for the sale. Tr. at 94–95. Deborah "didn't know" that Lillian Rosen signed the Rule 144K letters. 1/17/89 Mat. Dep. at 1857; *see* Tr. at 97–98.

Lillian Rosen's testimony confirms that Deborah had no knowledge as to the signing of the Rule 144K letters. Lillian Rosen testified that Eddie had Lillian sign Deborah's name to the Rule 144K letters. Tr. at 221. She admitted that she did not speak to Deborah before she signed the documents, and that she saw no reason to speak with Deborah. Tr. at 222–24. In fact, Lillian Rosen did not have any discussions with Deborah regarding the sale of the custodial stock, and did not know whether Deborah was aware of the fact that the stock had been sold. Tr. at 224, 227.

It is clear from the testimony of both Deborah and her mother that Eddie acted alone in effecting the sale of the custodial stock. In obtaining "Deborah Antar's" signature on the Rule 144K letters, Eddie acted without Deborah's knowledge. 1/17/89 Mat. Dep. at 1857; Tr. at 95, 223.

Two days after the stock was sold, Deborah signed some customer agreements and requests for taxpayer identification numbers with respect to the custodial accounts at Bear, Stearns & Company ("Bear, Stearns"). Px 21; Dx 2; Dx 7; Dx 16; Dx 21. But she did not know what she was signing. Instead of Bear, Stearns customer agreements, Deborah believed that she was signing documents making Eddie joint custodian. Tr. at 94. Deborah testified that "Mr. Serure had come to my house that Sunday and I signed

what I thought then was signing forms to change the custodianship to co-custodianship." Tr. at 91. Eddie was the person who told Deborah that the documents would make him joint custodian:

Q. And [Eddie] told you to sign the papers making you joint—making him co-custodian?

A. Yes.

Q. He told you it was important, didn't he?

A. Yes, he did.

Q. You did what he said, right?

A. Yes, I did.

Tr. at 98–99 (counsel's objection and Court's ruling omitted). Deborah accordingly signed forms that "I was told would change the custodianship from sole custodian to co-custodian of the proceeds from the sale of the stock because Eddie said, like, 'God forbid something happens to me.' So I did it." Tr. at 92.

In fact, the documents Deborah signed established the custodial accounts at Bear, Stearns, and did not have anything to do with making Eddie joint custodian. Px 21; Dx 2; Dx 7; Dx 16; Dx 21. Ted Serure testified at his deposition that he "picked up some documents from [Deborah] personally. I visited her home and she signed some documents." Dx 30 at 54. Serure obtained Deborah's signature "sometime during the period of time between the 27th and the 30th of June 1985." Id. at 55.

The documents that Deborah signed were the customer agreements entered into evidence as Defendants' Exhibits 2, 7, 16, and 21, and the requests for taxpayer identification numbers entered into evidence as Plaintiff's Exhibit 21. The parties have found no document signed by Deborah making Eddie joint custodian.

The manner in which the Bear, Stearns documents were signed directly refutes Deborah's contention that the sale of the custodial stock was a joint effort between herself and Eddie. The Court finds that if Eddie had been handling the various aspects of the stock sale with Deborah's knowledge and consent, he would have had no reason to misrepresent the nature of the Bear, Stearns

documents that she was signing. The signing of the Bear, Stearns documents demonstrates that Eddie effected the sale in a way that ensured Deborah knew as little as possible about it.

Eddie's handling of the $8 million in sale proceeds also shows that Eddie acted alone in selling the custodial stock. When asked at trial whether Eddie handled the deposit of the proceeds into an account at Bank Leumi Trust Company of New York, Deborah responded: "Completely." Tr. at 101–02. Deborah, on the other hand, did not know where the stock sale proceeds were going to be placed. Tr. at 130. She did not communicate with Bank Leumi regarding the investment of the $8 million. Tr. at 102. She never put her signature on file with Bank Leumi as custodian for the children. Id. Throughout 1985, she did not know that the $8 million had been deposited into Bank Leumi. 6/30/89 Mat.Tr. at 2260–61.

When he deposited the $8 million, Eddie unilaterally became joint custodian over the funds. The nominal defendants assert that "[a]s sole custodian of the stock, only [Deborah] could authorize [the] change" making Eddie joint custodian. 1/6/92 Defs. Brief, ¶ 57. That might be true as a legal matter, but as a matter of fact the change was made without Deborah's authorization. Eddie "magically" became joint custodian when the $8 million in sale proceeds was transferred from Bear, Stearns to Bank Leumi. Compare Dx 27 with Px 22. Deborah has conceded that she did not sign any signature cards or agreements with Bank Leumi regarding the custodial accounts. Tr. at 102. There is no document signed by Deborah making Eddie joint custodian—at Bank Leumi or anywhere else.

In August 1985, Eddie transferred the $8 million to the Cayman Islands without Deborah's knowledge. Px 22; Px 24, ¶ 13. Deborah did not learn of the transfer until nearly four years later, when she was informed of it by the judge presiding over the matrimonial case. Tr. at 103–04. The Court finds that Deborah's contention that the transfer was not concealed from her—because for four years she confused Bank Leumi's Grand Cayman branch, Px 22, with a Cadman Plaza

branch, Tr. at 103—is not credible. Indeed, Deborah's counsel informed the Court nearly two years ago that the transfer was a preparatory effort by Eddie to steal the $8 million from his own children. 3/29/90 Hearing Tr. at 10.

The circumstances existing before the sale of the custodial stock indicate that Eddie was the person who made the decision to sell. In March 1985, Eddie and others participated in a secondary public offering of 1.2 million shares of Crazy Eddie stock. Px 10. In that offering, Eddie sold 240,000 shares of stock as custodian for his nieces and nephews under the Uniform Gift to Minors Act. *Id.* at 87. No one told Deborah about this custodial sale, even though she purportedly had been badgering Eddie to sell the 300,000 shares at issue in this case. Tr. at 87.

The timing of the sale of the custodial stock was dictated, not by Deborah's knowledge or wishes, but by Crazy Eddie's public announcements of phenomenal performance—which were fueled in large part by a financial falsification that Eddie had ordered. The June 28 sale took place within weeks following Crazy Eddie's release of its Form 10K Report for fiscal year 1985. Px 12. That Report contained false representations of the company's financial performance. The day before the custodial stock was sold, Crazy Eddie announced its financial results for the first quarter of fiscal year 1986. The first sentence of the company's June 27 press release states: "Crazy Eddie, Inc. (NASDAQ:CRZY) today reported that new income for the first quarter ended June 2, 1985 more than doubled on a 53.2% sales increase." Px 15 at 1.

The Court finds that the SEC has proved, by clear and convincing evidence, that Eddie Antar was the person who decided to sell the custodial stock. According to Deborah's sworn statements, Eddie told her that he was selling the stock. Deborah followed Eddie's orders, but it was not her decision, nor did she even know that she could control the stock. As a matter of fact, Deborah never independently acted as the custodian for the stock—she merely followed Eddie's orders, as always.

Deborah's newfound explanations for her sworn statements are not credible. Through her explanations, Deborah seeks to make her prior statements mean the exact opposite of what they say. Moreover, the evidence surrounding the sale of the custodial stock demonstrates the truth of Deborah's sworn statements by showing the "heavy hand" of Eddie Antar throughout the sale of the custodial stock.

## THE NOMINAL DEFENDANTS DID NOT ESTABLISH THAT DEBORAH WAS THE PERSON WHO DECIDED TO SELL THE CUSTODIAL STOCK

The nominal defendants' version of events does not accurately reflect the way in which the custodial stock came to be sold. According to the nominal defendants, on the night of June 26, 1985 Deborah found out for the first time, "by reading a Proxy Statement," that she was divorced. Px 24, ¶ 9; *see* 1/6/92 Defs. Brief, ¶ 32. The Proxy Statement was brought to Deborah's attention by Lillian Rosen. 1/6/92 Defs. Brief, ¶ 33(F). Sometime in the morning on June 26, Lillian Rosen had been informed by Amelia Arazie that Amelia's daughter, Teri Arazie, had seen in the Proxy Statement a reference to Deborah as "the former wife of Eddie Antar." Tr. at 217–18, 233–34, 237–38; *see* 1/6/92 Defs. Brief, ¶ 33(C).

The nominal defendants contend that, because of her discovery that she was divorced, Deborah started to badger Eddie that she wanted the custodial stock sold. Tr. at 136–37; *see* 1/6/92 Defs. Brief, ¶ 39. There were many confrontations and many arguments in which Deborah repeatedly demanded that the stock be sold. Tr. at 59, 61; *see* Defs. Brief, ¶ 39. Eddie finally agreed. 1/6/92 Defs. Brief, ¶ 40. The next day Ted Serure called Deborah, and she said "yes" to selling the custodial stock. Tr. at 66–67, 130; *see* 1/6/92 Defs. Brief, ¶ 47. The stock was sold on June 28, 1985. 1/6/92 Defs. Brief, ¶ 48.

The Court finds a complete failure of proof supporting the nominal defendants' version of events and their assertion that Deborah was the person who decided to sell the custodial stock.

*The March 26, 1990 Declaration Is Incredible And Entitled To No Weight*

In her March 26, 1990 declaration Deborah stated for the first time that the custodial stock was sold as a result of her repeated demands. Px 24 ¶ 10. According to the declaration, Deborah made her repeated demands because she had found out, "by reading a Proxy Statement," that she was divorced:

> Toward the end of June 1985, I found out for the first time, by reading a Proxy Statement, that a divorce judgment had been entered.

Px 24, ¶ 9.

The Crazy Eddie Proxy Statement that Deborah read is dated June 28, 1985—the same day that the sale of the custodial stock was completed. Px 45; Tr. at 69–70. At trial, Deborah admitted that the June 28 Proxy Statement was the document that led her to conclude that she was Eddie Antar's former wife. Tr. at 69.

Robert Rosenbaum, the president of the printing company that prepared the Proxy Statement, testified that the document did not leave the printer's premises until 8:00 a.m. on June 28. Tr. at 192. The transfer agent for Crazy Eddie did not begin mailing the Proxy Statement until July 1. Px 47 ("On July 1 and completing July 2, 1985, I caused to be mailed . . . [the] Notice of Meeting and Proxy Statement"). Deborah therefore could not have read the Proxy Statement at any time before the sale of the custodial stock. Her discovery that she was divorced could not have caused the stock to be sold, because that discovery did not occur until after the sale.

The nominal defendants argue that what Deborah saw was a hypothetical "draft" proxy statement. This assertion is not supported by the evidence.

At trial, Deborah could not describe any characteristic that would identify the document she saw as a draft rather than the Proxy Statement itself:

> Q. When [Lillian Rosen] showed you the proxy statement, was it in the form of a booklet?

> A. I don't remember. It was a very hysterical conversation.

> Q. Did the proxy statement have anything on the left-hand margin?

> A. I have no remembrance of that.

> Q. Did it have anything at the top?

> A. I just remember looking at that paragraph. I don't remember anything else.

> Q. Mrs. Antar, did the proxy statement have any writing on it?

> A. It was just printed or typed, or whatever.

Tr. at 72.

Deborah has no basis for stating that the document she saw was a draft and not the Proxy Statement. Only Deborah could say whether she saw a draft of the Proxy Statement, and she says she cannot tell us. Tr. at 67–68, 72.

Deborah's trial testimony is inconsistent with her March 26, 1990 declaration. In her declaration, Deborah unambiguously stated that she learned of her divorced "by reading a Proxy Statement." Px 24, ¶ 9. At trial, however, she indicated that she did not read the Proxy Statement at all. Rather, she testified that Lillian Rosen "just basically shoved the paper in my face." Tr. at 68. Deborah stated further that she did not see any part of the Proxy Statement except the part that disclosed she was Eddie Antar's former wife. Tr. at 71. At trial, the Proxy Statement became a "piece of paper" that "looked like something from a prospectus or a proxy statement":

> Q. Mrs. Antar, how did you find out that you were divorced?

> A. My mother came running into the house with the piece of paper and she was screaming. "You're divorced."

> .      .      ,      .      .      .

> Q. She brought the piece of paper over and told you that you were divorced on the same day that you confronted Eddie. Is that your testimony?

> A. Yes, it is.

> Q. Do you know what kind of piece of paper your mother brought over?

A. I don't remember. It was—it looked like something from a prospectus or a proxy statement.

Tr. at 67–68. The Court finds that Deborah's lapsed memory is suspect and may have been caused by her seeing a copy of the *final* Proxy Statement in her attorney's office and perhaps noticing that it was dated the same day that the custodial stock was sold. When asked at trial: "The document that you were shown by your mother, did you ever see it after that date?", Deborah replied: "I know that I saw in my attorney's office a proxy statement. The particular paper that showed that paragraph to me by my mother, I don't know if I had ever seen that particular one that she had again." Tr. at 71–72. The nominal defendants assert that the Proxy Statement "at various times has been described as a prospectus, a proxy statement, and a shareholder's notice." 1/6/92 Defs. Brief at 59. That may be true. The one thing the Proxy Statement has never been described as is a draft. *See, e.g.*, Px 42, ¶ 14 ("the Shareholder's Notice"); Dx 31 at 122–24 ("the prospectus"); 1/17/89 Mat.Dep. at 1933 ("the prospectus"); Px 24, ¶ 9 ("a Proxy Statement").

Ever since the company's public offering in 1984, Deborah has been fully capable of distinguishing between final and draft documents prepared by Crazy Eddie, Inc. In the matrimonial trial, Deborah conceded that draft prospectuses came to her home:

Q. It is a fact, is it not, drafts of registration statements came to your home?

A. I don't know what a registration statement is.

Q. Prospectuses.

A. Oh, excuse me. At times, yes.

Tr. at 1611.

Deborah unambiguously identified the June 28 Proxy Statement in a declaration she prepared jointly with counsel. Surely counsel knew the difference between a Proxy Statement and a draft. Surely counsel, in helping Deborah prepare the March 26, 1990 declaration, asked Deborah questions to confirm that the declaration was accurate in identifying the document she read as "a Proxy Statement."

The nominal defendants assert that Deborah read only "a copy of the relevant page" of the Proxy Statement. 1/6/92 Defs. Brief, ¶ 33(F). Until the trial, no one had ever described the Proxy Statement as a single page rather than the complete document. *See, e.g.*, Px 42, ¶ 14 ("the Stockholder's Notice"); Dx 31 at 124 ("I thumbed through the pages"); 1/17/89 Mat.Dep. at 1933 ("the prospectus"); Px 24 ¶ 9 ("a Proxy Statement").

The marked inconsistencies between Deborah's trial testimony and her March 26, 1990 declaration cast considerable doubt on her credibility. Deborah cannot convince the Court that she is ignorant. Deborah found out about her divorce "by reading a Proxy Statement." The Proxy Statement was sent three days after the sale of the custodial stock. Thus, the circumstances surrounding the release of the Proxy Statement establish that Deborah's version of events is false.

*Deborah's Story Has Changed To Fit The Theory Of A "Draft" Proxy Statement*

Other critical elements of Deborah's story have changed. At her deposition in this case, Deborah testified as follows:

I became hysterical when I learned I was divorced and I started to badger [Eddie]. I started to badger him for my equitable distribution and that I wanted the children's stock sold because I didn't want them to be in the same predicament that I was.

After many confrontations with him and arguments with him, he finally agreed to sell the children's stock to placate me and he then promised me that I would get the same amount that the children's stock had gotten from its sale.

5/7/91 SEC Dep. at 131.

At trial, Deborah testified that, after she learned she was divorced, she "started to badger" Eddie about selling the custodial stock. Tr. at 59–60. She and Eddie had many confrontations and many arguments about selling the stock. Tr. at 61. She repeatedly demanded of Eddie that the stock be sold. Tr. at 59; *see also* Px 24, ¶ 10.

Eddie finally agreed to sell the stock. Tr. at 64.

The descriptive terms that Deborah used suggest a lengthy series of confrontations and arguments from the time she discovered she was divorced to the time Eddie purportedly agreed to sell the custodial stock. For example, when Deborah stated that she "badgered" Eddie before learning of her divorce, she described a process of multiple demands that lasted for many months. 5/23/91 SEC Dep. at 289.

The Court takes particular note of the following words that Deborah used to describe the badgering that purportedly occurred after she learned of her divorce: (a) "Started to badger;" (b) "many confrontations;" (c) "Many arguments;" (d) "Repeatedly demanded;" and (e) "Finally agreed." 5/7/91 SEC Dep. at 131; Tr. at 59–61, 64; Px 24, ¶ 10. At trial Deborah testified that the entire process of badgering Eddie—a process in which Deborah started to badger Eddie, had many confrontations and many arguments with him, and repeatedly demanded that the custodial stock be sold, until Eddie finally agreed—all occurred in one night. Tr. at 62. Deborah also testified that the "many" confrontations over the custodial stock turned out to number "maybe three or four." Tr. at 61.

The Court finds that Deborah's purported badgering of Eddie to sell the custodial stock could not have occurred all in one night. In testifying that it did take place in one night, Deborah has distorted the meaning of the words she previously used to describe the badgering. For example, the Court finds that "many" does not mean "maybe three or four." Deborah's attempt to compress into the shortest possible time frame the process of her badgering Eddie is another reason why the Court finds her testimony to be incredible.

But that is not all. At trial, the Court asked Deborah a series of questions establishing that Eddie did not live at the marital home at the time Deborah purportedly learned of her divorce. Tr. at 81. Deborah testified that "[m]ost of the time Eddie was just out of the house." Id. Deborah offered no explanation for why Eddie supposedly was at the house on the very night she allegedly learned of her divorce. Apparently, the nominal defendants found this point to be problematical. In their post-trial brief, they revealed for the first time that Deborah's supposed confrontations with Eddie about the sale of the custodial stock took place over the telephone. 1/6/92 Defs. Brief, ¶ 39. No evidence was presented to suggest that on the night she learned of her divorce, Deborah confronted Eddie by telephone.

The new theory of telephonic confrontations represents yet another change in Deborah's story. Deborah's testimony at trial indicates that she badgered Eddie in person rather than by telephone. Deborah testified that, after the confrontations, Eddie came back to Deborah's house and told her to sell the custodial stock. Tr. at 61. And Deborah testified that the way she badgered Eddie was that she would run after him and argue more. Tr. at 62–63.

The Court finds that it would be physically impossible for Deborah to "run after [Eddie] and argue more" while she is badgering him over the telephone. Similarly, it would be impossible for Eddie to "walk away" from Deborah by telephone or "come back" to a place where he had not been. The new theory of telephonic confrontations demonstrates that Deborah's story of how she badgered Eddie to sell the custodial stock continues to evolve even after the trial is over.

*The Evidence Of The Marital Relationship Makes Deborah's Current Story Implausible*

The nature of Deborah's relationship with Eddie makes it highly implausible that she would have confronted him with anything in June 1985, including the sale of the custodial stock. First, Deborah trusted Eddie when it came to money. She testified in the matrimonial case that, "[w]here money was concerned, I trusted Eddie completely and implicitly." 12/27/88 Mat.Dep. at 1080; *see also* Tr. at 116. At trial in this case, Deborah testified that she continued to trust Eddie until December 1986—a year and a half after

their alleged confrontations over the sale of the custodial stock. Tr. at 117.

On the night she found out she was divorced, Deborah met the news with expressions of continued trust in Eddie. Lillian Rosen, the person who informed Deborah of the divorce, testified that Deborah still trusted Eddie and continued to trust him. Tr. at 246.

Deborah's testimony about that night is the same as Lillian Rosen's. In her deposition in the matrimonial case, Deborah described in detail the night she found out she was divorced. On that night, Deborah told Lillian that "Eddie promised he would take care of me and I had nothing to worry about. It will all be taken care of." 1/13/89 Mat. Dep. at 1592. Deborah "told everyone not to worry. Eddie said he would take care of me." *Id.* at 1593.

The Court finds that Deborah's testimony about the night she found out about her divorce provides compelling evidence that Deborah did not badger Eddie later that very night to sell the custodial stock. If the above testimony represents Deborah's state of mind on that night, why would she feel compelled to badger Eddie so that her children would not be in the "predicament" she was in—having to "beg" someone for what was hers? Tr. at 60. The Court finds that the only plausible answer is that Deborah did not feel compelled to badger Eddie on that night.

In her September 21, 1987 affidavit, Deborah stated that "it was [Eddie] himself who, over the course of our marriage so annihilated me that I could do *only* as he asked." Px 1, ¶ 3 (emphasis in original). Deborah said it was "most crucial" for the matrimonial court to understand the "context" of her marriage with Eddie:

> It is most crucial that this Court understand the emotional and physical trauma I was subjected to prior to, simultaneously with, and *after* the execution of these documents (Agreement and Divorce). It is only within the context of my marriage that one can understand the destruction of

my ability to act in an independent and cogent manner with respect to [ ] Eddie.

Px 1, ¶ 11 (emphasis in original).

In her October 2, 1987 affidavit, Deborah stated that Eddie "has been and continues to be the controller of my life and that of our children. He relied upon my trust and my willingness to believe in his word." Px 2, ¶ 54. Deborah also asked the matrimonial court to accept her enormous dependence on Eddie: "It is hard to accept the enormity of my dependence—the enormity of my ability to be manipulated and molded. But it is simply the truth." Px 2, ¶ 55.

Deborah would now have this Court accept her contention that—even though Eddie was the controller of her life, and notwithstanding her enormous ability to be manipulated and molded by Eddie—Deborah confronted Eddie, demanded the sale of the custodial stock, and got his agreement to do so that very night. Considering the "context" of her marriage with Eddie, the Court finds Deborah's contention to be incredible.

In her deposition in the matrimonial case, Deborah testified that she was "afraid of going against [Eddie] or talking back against him. I was frightened every time. Not only was he physical, I was just scared of him." 12/12/88 Mat.Dep. at 427. Deborah also testified that she would never want to cross Eddie:

> You can understand that I would never, never want to cross Eddie. If you cross Eddie—I was so scared—and a lot were scared of him, I would never want to get close enough to that line to find out if he would break my legs.

12/13/88 Mat.Dep. at 646.

At the trial in this case, Deborah testified that she would have been afraid of Eddie if he had walked into the courtroom. Tr. at 106. She stated: "It's just always been such a fine line where he's concerned; that if he would have beaten me every day of my life, it would have been a lot easier than the other things he put me through." Tr. at 107. She told the Court: "I've always been in fear of Eddie." *Id.* The Court finds that Deborah's tragic mix of emotions toward Eddie—trust, dependence and fear—means one thing for

this case: her testimony of a single, explosive night of confrontations initiated by her, repeated demands by her, and eventual submission by Eddie, is not credible.

*The June 26 Draft Proxy Statement Demonstrates That Deborah's Testimony At Trial Was False*

The Court finds that the nominal defendants' theory that Deborah saw a draft proxy statement is refuted by the objective evidence presented to the SEC. The draft of the Proxy Statement that was entered into evidence as Plaintiff's Exhibit 44 establishes that Deborah could not have seen even a draft in time to confront Eddie and demand that the custodial stock be sold. Deborah testified at trial that on the night of June 26, 1985, she saw a document that referred to her as the "former wife of." Tr. at 68, 110. But Plaintiff's Exhibit 44 does not refer to Deborah as the "former wife of" Eddie Antar. Rather, the pertinent footnote in the draft refers to Deborah only as "custodian":

> (2) Includes (i) 2,088,330 shares owned by Eddie Antar directly, (ii) 240,000 shares held by Eddie Antar as custodian for the benefit of Eddie Antar's minor nephews and nieces and (iii) 300,000 shares held by *Deborah Antar as custodian for Eddie Antar's minor children.*

Px 44 at 1 n. 2 (emphasis added).

Two pages of Plaintiff's Exhibit 44 contain the notation "26–Jun–85 07:00" in the R.S. Rosenbaum banner line. Px 44 at 3, 10. Robert Rosenbaum testified that the date and time notation means "that the version of the page that you are looking at . . . is the latest version that was cleared on that date. The version that was cleared as of this time next to it." Tr. at 187. Plaintiff's Exhibit 44 is the draft proxy statement that cleared at 7:00 a.m. on June 26, 1985. As of that time and date, no one reading a draft of the Proxy Statement could discern that Deborah was Eddie Antar's "former wife."

Plaintiff's Exhibit 44 was the draft that was delivered to R.S. Rosenbaum's customers on June 26. Referring to Exhibit 44, Robert Rosenbaum testified as follows:

> Based on what we normally do, I'd have to say that nothing happened except that

we received material on the 25th of June and had it delivered on the 26th and that is the proofs—those are the pages from the proof set that we delivered.

> Nothing happened until the next date on the invoice, the 26th.

Tr. at 200.

Deborah testified that she learned of her divorce on the evening of June 26. Tr. at 110. Deborah says that she found out from Lillian Rosen, who showed her a "piece of paper" from the Proxy Statement. Tr. at 67–68. Lillian Rosen says she found out about the divorce when she arrived at Crazy Eddie, Inc.'s parking lot "some time in the morning" on the same day she informed Deborah. Tr. at 233–34.

The Court finds Deborah's contention that she learned of the divorce on June 26 to be highly implausible in light of the nine things that necessarily must have occurred between 7:00 a.m. and the time when Lillian Rosen arrived at Crazy Eddie's parking lot "some time in the morning" on June 26. First, the draft proxy statement that does not refer to Deborah as Eddie Antar's former wife cleared R.S. Rosenbaum's computers at 7:00 a.m. Second, someone had to take the time to add the "red-lining" marks that appear on nine of the draft's pages. Px 44. Third, the draft had to be delivered to R.S. Rosenbaum's customers. Tr. at 200. Fourth, at a point between 7:00 a.m. and "some time in the morning" on June 26, someone had to make the change from "Deborah Antar as custodian," Px 44, to "Deborah Antar, former wife of Eddie Antar." Px 45. The defendants offered no evidence to establish that this change occurred on the morning of June 26. Instead, Rosenbaum testified that the change "could have been on the 26th or the 27th." Tr. at 206.

There was more to the change than merely adding the words "former wife." As a comparison between the draft and the final Proxy Statement makes clear, the change also required a considered legal determination whether or not to include the 300,000 shares of custodial stock in the number of shares owned by Eddie Antar. The June 26 draft "[i]ncludes . . . (iii) 300,000 shares held

by Deborah Antar as custodian for Eddie Antar's minor children." Px 44 at 1 n. 2. In the final Proxy Statement the 300,000 shares are excluded.[1] It would have taken time to determine whether the Proxy Statement should include or not include the 300,000 shares in the number of shares owned by Eddie Antar.

Fifth, the nominal defendants have not offered any evidence that only one person reviewed the June 26, draft before further changes were made and sent to R.S. Rosenbaum. On the contrary, the printer made seventeen copies of the June 26 draft. Px 46. It is likely that more than one person reviewed the draft, which would have taken longer than between 7:00 a.m. and "some time in the morning" on June 26.

Sixth, the new, hypothetical draft with "former wife of Eddie Antar" would have been sent back to R.S. Rosenbaum. It then would have gone "between typesetters and proofreaders for an indeterminate time until the pages [were] okayed by the proofreaders for customers to see." Tr. at 188–89.

Seventh, the new draft would have been sent back to R.S. Rosenbaum's customers. Eighth, the new draft would have found its way to Teri Arazie, the person whom Lillian Rosen identifies as the source of the information that the Proxy Statement referred to Deborah as the "former wife of Eddie Antar." Tr. at 217–18, 238. It is highly unlikely that Teri Arazie saw a draft proxy statement at any time, much less between 7:00 a.m. and "some time in the morning" on June 26. R.S. Rosenbaum prepared only five copies of the next draft of the Proxy Statement. Px 46. The nominal defendants offered no evidence to suggest that Teri Arazie had access to one of those five copies.

Nor is there any evidence that Teri Arazie was even an employee of Crazy Eddie, Inc. at the time the Proxy Statement was prepared. When asked at trial if Teri Arazie was an employee, Lillian Rosen responded: "Yes. At one time. I don't know if she was an employee at that time, but at one time she was an employee." Tr. at 238. Ninth, on the morning of June 26, Teri Arazie would have told her mother, Amelia Arazie, that she saw in the draft proxy statement the reference to Deborah as the "former wife of Eddie Antar." Only if these nine events occurred between 7:00 a.m. and "some time in the morning" on June 26 would Amelia Arazie have had the necessary information to tell Lillian Rosen that Deborah was Eddie's former wife. The Court finds it highly unlikely that all of these events occurred in the space of a few hours in the morning of June 26.

The nominal defendants have proffered no evidence to support their theory that a draft proxy statement containing the "former wife" disclosure made its way from the drafters to Teri Arazie, from Teri Arazie to Lillian Rosen, and ultimately to Deborah.

Moreover, Lillian Rosen's testimony establishes the impossibility that Deborah's discovery of her divorce took place on the night of June 26. Lillian Rosen testified that Teri Arazie had called Amelia Arazie the night before Amelia told Lillian about the divorce: "Well, what happened was one of the workers in the office . . . told me that her daughter had called her the night before." Tr. at 217–18. Lillian stated that Teri Arazie made the discovery of Deborah's divorce by reading the Proxy Statement. Tr. at 237–38 ("[Amelia Arazie] told me her daughter called her. She saw it in the [Proxy Statement]"). Lillian Rosen reiterated that Teri Arazie made the discovery of Deborah's divorce the night before:

Q. Aunt Amelia told you: Terry called me last night—her daughter called last night—it's in the prospectus and I thought I would drop dead. Is that correct?

A. Yeah.

Tr. at 238. If Deborah learned of her divorce on the night of June 26, 1985, then Lillian Rosen's conversation with Amelia Arazie had to have occurred on the morning of June 26. But there is no way Teri Arazie

---

1. The footnote states: "(2) Includes (i) 2,088,330 shares owned by Eddie Antar directly and (ii) 240,000 shares held by Eddie Antar as custodian for the benefit of Mr. Antar's minor nephews and nieces *but does not include* 300,000 shares held by Deborah Antar, former wife of Eddie Antar, as custodian for Mr. Antar's minor children." Px 45 at 1 n. 2 (emphasis added).

could have seen, on the night before June 26, a draft proxy statement that referred to Deborah as Eddie Antar's former wife. The "night before" was June 25. But through the night of June 25 and at least up to 7:00 a.m. on June 26, the draft proxy statement did not refer to Deborah as the former wife of Eddie Antar. Px 44. Lillian Rosen's testimony therefore establishes that Deborah could not have learned of her divorce on the night of June 26.

The nominal defendants' solution to the fatal problem caused by Lillian Rosen's testimony is to attempt to change that testimony. They assert that Teri Arazie "called the night before to say that proxy material for the upcoming Crazy Eddie, Inc. annual meeting would say that Deborah Rosen Antar and Eddie Antar were divorced." 1/6/92 Defs. Brief, ¶ 33(C). In direct refutation of this characterization, Lillian Rosen unambiguously testified that Teri Arazie read the "former wife" disclosure instead of predicting that the disclosure would be inserted into the Proxy Statement later. According to Lillian Rosen's testimony at trial, Amelia Arazie told Lillian "that her daughter called her. She saw it in the prospectus." Tr. at 238. And in an excerpt of her deposition testimony, an excerpt that the nominal defendants themselves introduced into evidence—Lillian testified that Amelia told her "Terry called me. Her daughter called last night. It's in the prospectus." Dx 31 at 123.

The nominal defendants' attempt to change Lillian Rosen's testimony into something it is not only convinces the Court even more that Deborah could not have learned of her divorce on the night of June 26.

But there is still more. Under the nominal defendants' version of events, Deborah's first contact with Ted Serure had to have occurred on June 27—the day before the sale of the custodial stock. Tr. at 66–67. But Serure testified in his deposition that he had "numerous conversations" with Deborah that began two or three days before the transaction:

Q. Mr. Serure, in your conversation, your first conversation of a business nature with Deborah Rosen Antar, did you describe the transaction that was about to be undertaken to her, and did she merely say yes in response to your statements to her, or merely say okay in response to your statements to her.

A. Which conversation are you talking about, specifically? I had numerous conversations with her and I met her in person. Which conversation are you specifically talking about?

Q. When did you understand for the first time that the custodial stock for the children was to be sold.

A. After my first communication with Debbie Antar which was—I don't know whether it was two or three days. I don't recall specifically before the actual transaction. But sometime before the actual transaction.

Dx 30 at 37–38. Ted Serure's first communication with Deborah took place two or three days before the transaction—i.e., on June 25 or June 26. Id. That was before the night of June 26, when Deborah supposedly confronted Eddie after learning that she was his "former wife." Tr. at 110.

The nominal defendants argue that the entire process of selling the custodial stock took place between "early afternoon" on June 27 or June 28. Tr. at 66–67, 109–10. In this argument, they perform another about-face from the positions Deborah embraced in the matrimonial case. Through counsel, Deborah asked the matrimonial court to find the June 27–28 to be too compressed: "Now look at what this man [Serure] was able to accomplish between a June 27, 1985 telephone conversation with Deborah Antar (in New Jersey) and June 28, 1985. It indicates the lack of credence to be accorded his testimony." Px 5 at 43. The Court agrees with Deborah's earlier position that Serure could not have done all he had to do between "early afternoon" on June 27 and the sale of the custodial stock on June 28.

An affidavit that Deborah swore to in the matrimonial case on October 18, 1988 demonstrates that the document that informed Deborah of her divorce was the final Proxy Statement and not a hypothetical "draft." In paragraph 14 of that affidavit, Deborah ad-

dressed "the question of when I found that I was divorced":

> In June, 1985, when the Stockholder's Notice [2] (movant's Exhibit "H") was sent, my family first learned that I was the "former wife" of Eddie Antar. My mother and others called me in shock. Believing that I would still get my equitable distribution from Eddie, I tried to assure them that Eddie was going to take care of it: and Eddie kept promising me that he would.

Px 42, ¶ 14.

The Court finds that Deborah's October 18, 1988 affidavit confirms that she saw a final Proxy Statement. In the affidavit, Deborah states that the discovery of her divorce occurred when the Stockholder's Notice was sent. Px 42, ¶ 14. The nominal defendants have proffered no evidence to suggest that Crazy Eddie, Inc. had a practice of sending its draft proxy statements to anyone. Furthermore, the affidavit refers to the "Stockholder's Notice," and not to a draft of the Stockholder's Notice. Px 42, ¶ 14. Finally, the affidavit confirms that Deborah still trusted Eddie even when she learned that he had divorced her without giving her an equitable distribution. Px 42, ¶ 14.

The nominal defendants seek to "explain" Deborah's affidavit by arguing that it concerns the question of when various members of Deborah's family found out Deborah was divorced, and not when Deborah did. 1/6/92 Defs. Brief, ¶ 90. The Court finds this argument to be unpersuasive. The New York Appellate Division—to whom the affidavit is addressed—would have no interest in knowing when Deborah's family discovered she was divorced. The only pertinent issue, and the issue Eddie's lawyers had raised, was when Deborah found out she was divorced. Px 42, ¶ 14 ("The last documents, which [Eddie] annexes as exhibits, concern the question of when I found out that I was divorced."). The overwhelming evidence establishes that Deborah found out about her divorce when the Proxy Statement was sent in early July 1985.

In support of their version of events, the nominal defendants rely on testimony that Deborah and Lillian Rosen gave in the matrimonial case in which they purportedly identified June 1985 as the month they found out Deborah was divorced. *See* Defs. Brief, ¶¶ 65, 72, 88. The nominal defendants claim that Deborah was able to distinguish in her memory between late June and early July 1985—a difference of days that transpired more than three years before Deborah's matrimonial testimony.

The objective, documentary evidence compiled by the SEC establishes the impossibility that Deborah's divorce discovery occurred in June 1985. In addition, detailed and persuasive evidence that the SEC has submitted in its reply papers convinces the Court that Deborah and Lillian Rosen were mistaken in their matrimonial testimony—even assuming that such testimony can be interpreted as precisely identifying June as the month in which Deborah learned of her divorce.

When she began the matrimonial case, Deborah had no recollection of her discovery that she was divorced. In a deposition taken in April 1988, Deborah testified that she found out she was divorced when Eddie told her:

> Q. When did you first find out you were divorced?
>
> A. When Eddie told me one day we were divorced.

4/28/88 Sol.Dep. at 75. This testimony was clearly incorrect. In her affidavits, Deborah stated that over the two years after January 1985, "Eddie acted as if we, indeed, were still married and I did not ever learn from him that we weren't." Px 1, ¶ 22(u); Px 2, ¶ 21(u)). It was not until Eddie's lawyers produced the June 28, 1985 Proxy Statement that Deborah's memory was refreshed on her discovery of her divorce. Shortly after her counsel received a copy of the Proxy Statement, Deborah signed her October 18, 1988 affidavit—in which she agreed that she first learned of her divorce when the Proxy State-

---

**2.** The term "Stockholder's Notice" in Deborah's affidavit refers to the June 28, 1985 Proxy Statement. Px 45. The first page of the Proxy Statement is a letter to shareholders. The second page is captioned "Notice of Annual Meeting of Stockholders." Px 45. The remaining pages constitute the Proxy Statement proper.

ment was sent. Px 42, ¶ 14. Not having the certificate of mailing prepared by Crazy Eddie's transfer agent—a document that establishes a July 1 mailing date—Deborah mistakenly stated that the Proxy Statement was sent in June 1985. *Id; see* Px 47.

Less than three months after her October 18, 1988 affidavit, Deborah testified again on the subject of her discovery that she was divorced. Deborah testified that it was "June of 1985, around there, that I learned for certainty" of the divorce. 1/12/89 Mat. Dep. at 1361. At the same time, Deborah had no memory as to the timing of events surrounding Eddie's sale of the custodial stock on June 28, 1985.[3] *See* 1/13/89 Mat. Dep. at 1529–30, 1560–62; 6/30/89 Mat.Tr. at 2260. Nevertheless, by the time of the matrimonial trial in June 1989, Deborah had become "certain" that she discovered her divorce in June 1985. 6/29/89 Mat.Tr. at 1996–97; 2008.

Lillian Rosen's memory during the matrimonial case was no better than Deborah's. Lillian testified that she learned of Deborah's divorce by reading "a prospectus that came out, like—around June. I can't tell you the date." Dx 31 at 122–23. Lillian was deposed only one month after Eddie's lawyers had produced the June 28 Proxy Statement. Dx 31, cover page.

Based on the matrimonial testimony compiled by the SEC, the Court finds that Deborah's identification of June 1985 as the month she learned of her divorce was an error caused by her reading of the June 28 date that appeared on the Proxy Statement, which was produced by Eddie's lawyers shortly before Deborah's testimony. *See* Px 45. The certificate of mailing—which Deborah never saw during the matrimonial case—confirms that Deborah's divorce discovery occurred sometime after July 1, 1985, the date when the Proxy Statement was sent to Crazy Eddie's shareholders. Px 47.

In addition, Deborah's assertion that she learned of her divorce shortly before the sale of the custodial stock does not make any sense when viewed against the evidence.

The fact that as of June 30, 1985 Deborah was willing to authorize Eddie's custodial control provides strong evidence that, at the time the stock was sold on June 28, Deborah did not know she was divorced. *See* Tr. at 92, 98–99. According to Deborah, little more than three days before her "authorization" making Eddie joint custodian, she had learned that Eddie had defrauded her of millions of dollars. Any person—including Deborah—would have been "angered and frightened by the sudden discovery that she had been deprived of equitable distribution and was bereft of assets." 1/6/92 Defs. Brief at 59. The Court cannot believe that Deborah would then agree to make the same evil defrauder a joint custodian over her children's $8 million nest egg—and do so a mere three days after discovering the fraud.

Lillian Rosen's testimony also establishes that the divorce discovery occurred after the sale of the custodial stock. Lillian testified at her deposition that, when she signed the Rule 144K letters—dated June 28, 1985—she did not speak to Deborah because she trusted Eddie. Tr. at 223 ("I trusted Eddie"). According to Deborah's version of events, Lillian performed this act of trust in Eddie less than two days after she learned that he had defrauded her daughter of millions of dollars and had threatened to kill Lillian and break her hands and legs. Tr. at 246–48. The Court cannot believe that Lillian's act of trust in Eddie occurred at any time, much less two days after she made this awful discovery.

*The Nominal Defendants Offered No Evidence To Support Deborah's Testimony At Trial*

The nominal defendants have offered no evidence that the phrase "former wife of Eddie Antar" was inserted into a draft of the Proxy Statement at a point between 7:00 a.m. on June 26 and Lillian Rosen's arrival at Crazy Eddie "some time in the morning" on the same day. *See* Px 44; Tr. at 233–34. They offered no evidence that Teri Arazie read a draft proxy statement—either on the

---

3. Indeed, there is no testimony in the matrimonial record indicating that these two events—the divorce discovery and the sale of the stock—were even related to each other either in a temporal or a causative sense.

morning of June 26 or at any time. They offered no evidence as to the reason why Eddie supposedly came to Deborah's house on the very evening Deborah supposedly discovered that they were divorced. They offered no credible evidence that Deborah discovered that they were divorced. Finally, they offered no evidence that Deborah confronted Eddie "by telephone."

For the reasons set forth above, the Court finds that the sale of the custodial stock was not caused by Deborah after she had learned, "by reading a Proxy Statement," that she was the former wife of Eddie Antar. It is clear that Deborah could not have read the Proxy Statement—or even a draft of the Proxy Statement—in time to confront Eddie and demand the sale of the custodial stock. Based on all of the evidence presented, the Court hereby finds that, in the matrimonial action, Deborah correctly identified Eddie Antar as the person who decided to sell the custodial stock. To the extent that Deborah has unconvincingly attempted to "explain" her earlier statements, it is not beyond the pale of human experience that a mother would tailor her testimony to shield her children, and their money, from the harsh impact of their father's wrongful actions.

### EDDIE ANTAR SOLD THE CUSTODIAL STOCK WHILE POSSESSING INSIDE INFORMATION OF THE FRAUD AT CRAZY EDDIE, INC.

At a hearing held on January 23, 1990, the Court entered preliminary findings that Eddie Antar directed a financial fraud at Crazy Eddie in fiscal year 1985. The Court stated as follows:

> [T]he evidence before me clearly indicates—and it is basically uncontroverted, since I have no controverting affidavits by Mr. Antar nor anyone on his behalf—that these overstatements of pre-tax income were caused and were as a result of Mr. Antar's actions in the first instance overstating the inventory by some $2 million in 1985.
>
> It is clear to me, based upon my review of the affidavits and the depositions which were submitted to me by the plaintiff in this action, that Mr. Antar was, in fact, the one who ordered the company's warehouse

manager, Mr. Neiderbach, to inflate the company's inventory by $2 million.

1/23/90 Hearing Tr. at 47–48.

In support of its motion for summary judgment against the nominal defendants the SEC submitted virtually the same evidence of fraud at Crazy Eddie in 1985. In addition, the SEC submitted more recent deposition testimony of Eddie's accusers which further strengthened the SEC's proof of fraud. Based on these findings, and without holding an evidentiary hearing, the Court issued a preliminary injunction against Eddie Antar and ordered him to repatriate approximately $55,000,000 that he had transferred to foreign locations.

For the purposes of its case against the nominal defendants, the SEC has established that the inflated financial results caused by Eddie Antar's conduct were publicly announced by Crazy Eddie, Inc. in a press release dated May 2, 1985. Px 11. The company also included the falsified financial results in its Form 10K Report filed with the SEC on June 3, 1985—little more than three weeks before Eddie's sale of the custodial stock. Px 12.

For nearly a year, the nominal defendants had an opportunity to pursue document and deposition discovery in an attempt to establish a genuine issue of fact as to Eddie Antar's involvement in fraud at the time he sold the custodial stock. The nominal defendants had a full opportunity to cross-examine each of Eddie Antar's accusers. Notwithstanding these opportunities, the nominal defendants have failed to produce a sworn affidavit or testimony contradicting Eddie Antar's involvement in an inventory fraud at Crazy Eddie, Inc. in fiscal year 1985. For these reasons, the Court finds that there is no genuine issue of fact that Eddie Antar sold the custodial stock at a time when he had material, non-public information that Crazy Eddie's financial results were fraudulently overstated. The Court finds that Eddie Antar's sale of the custodial stock was in violation of section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule

10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

## CONCLUSIONS OF LAW

### THE COURT HAS SUBJECT MATTER JURISDICTION OVER THE SEC'S CLAIM AGAINST THE NOMINAL DEFENDANTS

In their October 10, 1991 cross-motion for summary judgment, the nominal defendants challenged the Court's subject matter jurisdiction over the SEC's claims against them for constructive trust and unjust enrichment. For the reasons set forth below, the Court finds that it has jurisdiction.

*The Court Has Jurisdiction To Order Disgorgement Of Illegal Profits To Which Nominal Defendants Have No Legitimate Claim*

The Court has subject matter jurisdiction over this action pursuant to section 20 of the Securities Act and sections 21 and 27 of the Exchange Act. According to the Exchange Act, the SEC may bring an action in federal court "[w]henever it shall appear … that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter." Exchange Act § 21(d)(1), *codified at* 15 U.S.C. § 78u(d)(1). The Exchange Act also provides that the federal courts "shall have exclusive jurisdiction of … all suits in equity and actions at law brought to enforce any liability or duty created by this chapter." Exchange Act § 27, *codified at* 15 U.S.C. § 78aa. Subject-matter jurisdiction under the Securities Act is substantially similar. Securities Act §§ 20(b), 22(a), *codified at* 15 U.S.C. § 77t(b), 77v(a).

■ Where a federal court has subject matter jurisdiction, it has the authority to grant the full panoply of equitable remedies so that the plaintiff can obtain complete relief. *SEC v. Materia,* 745 F.2d 197, 200 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 390 (2d Cir.1973) *cert. denied,* 414 U.S. 910, 94 S.Ct. 931, 932, 38 L.Ed.2d 148 (1973). In SEC enforcement actions, the courts have provided varied forms of equitable relief—including disgorgement, asset freezes, appointments of receivers and repatriation—even though the jurisdictional sections of the securities statutes refer only to injunctions against violations.[4] A constructive trust and disgorgement of unjustly retained wealth—the relief sought against the nominal defendants—are long-standing remedies that are within a court's equity powers. *See, e.g., SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307 (2d Cir. 1971) ("the Supreme Court … has upheld the lower courts in granting restitution, as an ancillary remedy in the exercise of the courts' general equity powers to afford complete relief"), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971); *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919) (Cardozo, J.) ("[a] constructive trust is the formula through which the conscience of equity finds expression").

■ Moreover, the securities statutes vest federal courts with jurisdiction over claims against non-violators. In *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), the Supreme Court ruled that a federal court had jurisdiction over a claim in a securities fraud action seeking relief from a non-party who held funds sought by the plaintiffs. *Id.* at 288–89, 61 S.Ct. at 233. The Supreme Court noted that a jurisdictional section of the Securities Act permitted actions "brought *to enforce* any liability or duty created by [the Act]." *Id.* at 288, 61 S.Ct. at 233 (emphasis original). In discussing this provision, the Supreme

---

4. *See, e.g., SEC v. American Board of Trade, Inc.,* 830 F.2d 431, 438 (2d Cir.1987) (asset freeze), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1118, 99 L.Ed.2d 278 (1988); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1105 (2d Cir.1972) (receiver appointed); *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307 (2d Cir.1971) (disgorgement), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971); *SEC v. Antar,* Civ. No. 89–3773 (NHP) (D.N.J. Feb. 9, 1990) (order requiring Eddie Antar to repatriate assets), *appeal dismissed,* No. 90–5095 (3rd Cir. March 20, 1990); *United States v. Cannistraro,* 694 F.Supp. 62, 71 (D.N.J.1988) (asset freeze), *modified,* 871 F.2d 1210 (3rd Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991).

Court stated that the lack of language expressly conferring jurisdiction on non-violators was not significant: "That it does not authorize [a] bill [in equity as to third parties] in so many words is no more significant than the fact that it does not in terms authorize execution to issue on a judgment recovered under [the statutory provision authorizing the private right of action.]." *Id.* In the Supreme Court's view, jurisdiction over third parties was properly based on the intention underlying the "Act as a whole" and the unavoidable implication that the Act intended "the power to make effective the right of recovery afforded by the Act." *Id.* at 287–88, 61 S.Ct. at 233.

Other courts have held that plaintiffs can obtain relief against non-parties in federal securities actions. *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1338 (2d Cir.) (district court had jurisdiction under Exchange Act to restrain non-violators from disposing of assets claimed by the plaintiffs), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Tcherepnin v. Franz,* 485 F.2d 1251, 1257 (7th Cir.1973) (district court had jurisdiction over claims asserted by a receiver to recover real estate in the hands of non-parties purchased out of proceeds misappropriated by the defendants or their nominees), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974); *SEC v. Wencke,* 783 F.2d 829, 830–31 (9th Cir.1986) (district court exercised jurisdiction over claims asserted by a receiver in an SEC action seeking disgorgement of corporate shares and profits from a non-party that had obtained the property from the securities violator), *cert. denied,* 479 U.S. 818, 107 S.Ct. 77, 93 L.Ed.2d 33 (1986).

In *Securities and Exchange Commission v. Cherif,* 933 F.2d 403 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 966, 117 L.Ed.2d 131 (1992), the United States Court of Appeals for the Seventh Circuit considered whether the district court had subject matter jurisdiction to issue an injunction freezing certain brokerage and bank accounts which allegedly had facilitated the Exchange Act violator's illegal trades. The accounts were in the name of Khaled Sanchou, who was termed a "nominal defendant" in the SEC's Complaint. The court concluded that the validity of the district court's injunction depended upon whether Sanchou was, in fact, a nominal defendant against whom the SEC need not assert an independent basis of subject matter jurisdiction. If the SEC was proceeding against Sanchou as a securities laws violator, then he was improperly named a nominal defendant and the injunction was improper. The SEC would have to amend its complaint to state a claim directly against Sanchou to recover the monies held in his accounts.

The Seventh Circuit remanded the matter "so that Sanchou's and [the alleged SEC violator's] respective rights in the accounts and Sanchou's party status [could] be sorted in an evidentiary hearing." In reaching this conclusion the Seventh Circuit noted:

> A court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them. Courts have jurisdiction to decide the legitimacy of ownership claims made by non-parties to assets alleged to be proceeds from securities law violators.

*Id.* at 414 n. 11 (citing *Tcherepin v. Franz,* 485 F.2d 1251 (7th Cir.1973)). The court defined "nominal defendant" as "a person who can be joined to aid the recovery of relief without an assertion of subject matter jurisdiction only because he has no ownership interest in the property which is the subject of the litigation." The court concluded that "[i]f Sanchou's accounts were never meant to be anything but the means for *Cherif* to carry out his scheme, the injunction is valid because Sanchou is properly termed a "nominal defendant."

According to *Cherif,* a district court has power to grant relief with respect to property to which non-violators have no valid claim. Under these circumstances, the touchstone for jurisdiction is whether the non-party's claim to the property is legitimate, not whether the party is innocent of fraud or wrongdoing.

The Second Circuit's decision in *International Controls Corp. v. Vesco* also establishes that the courts can grant relief, under the

federal securities laws, against non-parties who have no legitimate claim to contested property. The court in *Cherif* favorably cited the *Vesco* decision and stated that *Vesco* "is instructive concerning the evidence that can be brought forth in an evidentiary hearing to support the issuance of an injunction against a non-party under 15 U.S.C. §§ 78u(d) and (e)." *Cherif,* 933 F.2d at 415 n. 14.

The plaintiff in *Vesco* sought a preliminary injunction to restrain the disposition of 846,-380 shares of common stock owned by Vesco & Co., an entity that was not charged with securities fraud. 490 F.2d at 1338, 1340. As described in the Second Circuit's opinion, Vesco & Co. was strikingly similar to the arrangement that Eddie Antar used in his fraudulent sale of the custodial stock:

> Vesco & Co., it appears, was incorporated in Delaware on July 12, 1972 as an estate planning device for Robert Vesco.... The common stock of Vesco & Co. is owned by Patricia Vesco, Vesco's wife, as custodian for Vesco's children. The sole asset of Vesco & Co. is the block of [plaintiff's] common stock which, through the additional contributions of Vesco's children, totals 846,380 shares. Furthermore, we have been advised that the officers of Vesco & Co. are Mrs. Vesco and defendant Shirley Bailey, Vesco's personal secretary.

490 F.2d at 1349. The Second Circuit recognized that "facts such as these ... can hardly be characterized as common, routine or without the semblance of taint." *Id.* The court held that Vesco & Co.'s ownership of the plaintiff's stock was insufficient to bar the district court's assertion of jurisdiction:

> [A]lthough [plaintiff] does not claim [its] common stock represents the fruits of Vesco's fraudulent conduct, nevertheless, we believe that the district court had ample power, as a court of equity, to reach those assets under the jurisdictional purview of the 1934 Act.

*Id.* at 1351:

Another decision supporting subject matter jurisdiction in the present instance is *Securities and Exchange Commission v. Glauberman,* No. 90 Civ. 5205, 1992 WL 175270 (S.D.N.Y. Jul. 16, 1992). In *Glauber-* *man,* the SEC sought disgorgement of funds that defendant Eben Putnam Smith allegedly created by (1) buying and selling securities in certain accounts maintained on behalf of his children pursuant to the Connecticut Uniform Gifts to Minors Act, thereby generating at least $243,227 in illegal trading profits; and (2) depositing $248,000 into the custodial accounts during and after the insider trading scheme. The SEC sought disgorgement from the defendant's children on the ground that the custodial accounts had obtained the funds as part of an insider trading scheme and under circumstances in which it was not just or equitable for the children to retain the funds.

The SEC negotiated a settlement with Eben Putnam Smith requiring disgorgement of all of the children's unlawful trading profits, or $491,227. The SEC then moved for an order from the district court determining that the settlement was fair to Smith's children. The children, appearing through a guardian *ad litem,* objected to certain portions of the proffered settlement.

The one category of disgorgement that the Smith children had no objection to is virtually indistinguishable from the disgorgement sought in this case—i.e., unlawful profits generated by defendant Smith's insider trading in the custodial accounts. However, the children did object to the settlement provisions requiring disgorgement of funds that Smith had deposited into the custodial accounts, but which were not directly attributable to securities trading in the custodial accounts.

On July 16, 1992, the district court approved the entire settlement proffered by the SEC, holding that "[b]ecause by any legal or conventional standard of fairness the proposed settlement is fair to the Smith minors, the SEC's motion is granted and the settlement is approved." Slip Op. at 1, 1992 WL 175270. The District Court went on to state that "there is no reason why a transfer even to a nominal third party cannot be reached to effect disgorgement." *Id.* at 3.

The district court concluded as follows:

> Finally, it bears mention ... that the guardian *ad litem* does not argue that the Smith minors in any sense earned this

money, nor does he deny that even after disgorgement their trust funds will be left with more than $600,000. It is impossible to credit an argument in behalf of such minors that they are being treated unfairly.

Slip Op. at 4.

Under the holdings of *Cherif, Vesco,* and *Glauberman,* this Court concludes that it has subject matter jurisdiction over non-violators who have no legitimate claim to illegal profits created through securities fraud.

*The Court Has Subject Matter Jurisdiction Over The Nominal Defendants In This Case*

■ In the present case, the nominal defendants do not have a legitimate claim to the illegal profits that were created through Eddie Antar's fraudulent sale of the custodial stock. For reasons set forth below, the Court concludes that it has subject matter jurisdiction over the fruits of fraud that are currently retained by the nominal defendants.

The evidence establishes that Eddie Antar dominated the custodial accounts. As in *Vesco,* the principal, in fact sole, source of wealth in the custodial accounts is Eddie Antar. He was the one who purportedly conveyed the stock to the nominal defendants, through a mechanism similar to the "estate planning device" employed in *Vesco.* 490 F.2d at 1349. As in *Cherif,* Eddie Antar's " 'industry' was the source of the funds added to the initial deposit." 933 F.2d at 415. Moreover, Eddie was the person who made and implemented the decision to sell the custodial stock. As in *Cherif,* Eddie had actual trading power over the custodial accounts and, "[a]t the time he was trading, he used the accounts exclusively." *Id.* The sale of the custodial stock was made at a time when Eddie possessed inside information that Crazy Eddie's financial results had been fraudulently overstated.

After the sale, Eddie took sole control over the custodial proceeds. Without Deborah's knowledge, he deposited the $8 million of proceeds into accounts that he opened at Bank Leumi Trust Company of New York. Without Deborah's knowledge, he then transferred the $8 million to the Cayman Islands.

Deborah did not know where the money was until four years later.

Eddie's intention to retain sole control over the custodial proceeds is established by a letter he wrote to Bank Leumi on May 13, 1987. Px 23. In that letter, Eddie informed Bank Leumi: "I am concerned that my former wife may attempt to utilize the [custodial] accounts, make withdrawals therefrom, or seek to move them to a different depository." *Id.* Eddie directed the bank that his control over the custodial funds was to be maintained:

> I do not wish to effect unfavorably the excellent relationship I have always enjoyed with your bank, but I must instruct you in view of the circumstances that you may not permit any transactions whatsoever with respect to said accounts to be made by Mrs. Deborah Antar, and that if any such transactions are permitted, I would be required, in duty to my children, to hold your bank strictly accountable and liable therefor.

*Id.* The Court concludes that Eddie Antar's absolute control over the custodial accounts demonstrates that those accounts were "never meant to be anything but the means for [him] to carry out his [fraudulent] scheme." *Cherif,* 933 F.2d at 415.

In this case, the SEC requests disgorgement, not of the entire proceeds of Eddie Antar's sale of the custodial stock, but only of the illegal profits. The Court finds that the nominal defendants do not have a legitimate claim to the illegal profits that Eddie stole from the public investors in Crazy Eddie. To allow the nominal defendants to keep the illegal proceeds would give potential violators a blueprint for pursuing "estate planning" through securities fraud. Corporate managers could create the "custodial stock," falsify their company's financial results, and then sell the "custodial stock" at prices that are inflated by the fraudulent results. Thus, the violator's chosen beneficiaries would unlawfully profit from the violator's having duped innocent market participants into "investing" in his company. The Court cannot condone such an inequitable result in this case.

The nominal defendants cannot keep money that is not theirs. This Court has jurisdiction over illegal profits regardless of whether Eddie Antar fraudulently traded for himself or, instead, generated the illegal profits for his children by using an "estate planning device" that he created.

## THE SEC IS ENTITLED TO A CONSTRUCTIVE TRUST OVER THE ILLEGAL PROFITS HELD BY THE NOMINAL DEFENDANTS

■ The Court concludes that it is appropriate to impose a constructive trust on the illegal profits resulting from Eddie Antar's sale of the custodial stock. In *Cherif,* the Seventh Circuit expressly declined to consider whether subject matter jurisdiction attached to constructive trustees who did not commit securities fraud:

Before this Court the SEC argues that a constructive trust might be imposed in favor the injured investors under Illinois state law. Apparently the viability of this option was not explored by the district court and thus will not be considered.

933 F.2d at 414. In contrast to *Cherif,* the SEC has in this case sued the nominal defendants as constructive trustees. With reference to the illegal profits generated by Eddie Antar through the sale of the custodial stock, the SEC specifically alleges that the nominal defendants "hold all or portions of these funds as constructive trustees." 4/9/90 Amended Complaint, ¶ 98.

In a seminal case, Judge Cardozo provided the courts with the following definition for a "constructive trustee":

A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

*Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919).

For the reasons set forth below, the Court finds that the nominal defendants fall within the definition of constructive trustees. Eddie Antar committed a wrongful act in selling the custodial stock after he had personally caused Crazy Eddie's financial results to be fraudulently overstated. The funds now held by the nominal defendants are directly traceable to Eddie's wrongful act. And the nominal defendants have been enriched unjustly at the expense of defrauded public investors in Crazy Eddie. It is not necessary for the person holding illegal profits to have done anything wrong for that person to be required to return the profits to their rightful owners. Instead, "[t]he courts impose the remedy of constructive trust where, *rightfully or wrongfully,* a party has obtained property that unjustly enriches him." *United States v. Cannistraro,* 694 F.Supp. 62, 72 n. 11 (D.N.J.1988) (emphasis added), *modified,* 871 F.2d 1210 (3rd Cir.1989). *Accord Rollins v. Metropolitan Life Insurance Co.,* 863 F.2d 1346, 1354 (7th Cir.1988) ("a constructive trust may be invoked even where the unjustly enriched person is completely blameless"); *Pension Fund–Mid–Jersey Trucking Industry v. Omni Funding Group,* 687 F.Supp. 962, 966 (D.N.J.1988) ("a constructive trust can be imposed upon even a blameless [party]"); *Simonds v. Simonds,* 45 N.Y.2d 233, 380 N.E.2d 189, 194, 408 N.Y.S.2d 359 (1978) ("[u]njust enrichment ... does not require the performance of any wrongful act by the one enriched"). For the reasons expressed above, the Court finds the nominal defendants in the present case are liable as constructive trustees.

The nominal defendants are also subject to the doctrine of unjust enrichment. To recover under this doctrine, a plaintiff must establish that the defendant was enriched and that "the circumstances dictate that, in equity and good conscience, the defendant should be required to turn over its money to the plaintiff." *Universal City Studios, Inc. v. Nintendo Co.,* 797 F.2d 70, 79 (2d Cir.1986), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). *Accord, Dolmetta v. Uintah National Corp.,* 712 F.2d 15, 20 (2d Cir.1983).

Unjust enrichment is present here. The nominal defendants should not be allowed to retain funds that are the product of Eddie Antar's securities fraud. Their enrichment came at the expense of defrauded investors. As between the nominal defendants and the

victims of fraud, equity dictates that the rights of the victims should control. At a minimum, Eddie Antar gave his children a gift derived from a fraud perpetrated on public investors. The circumstances dictate that, in equity and good conscience, the nominal defendants are required to return the gift to the victims. The Court concludes that the nominal defendants should be ordered to disgorge the illegal profits arising from Eddie Antar's sale of the custodial stock.

## THE SEC'S CLAIM IS NOT BARRED BY A STATUTE OF LIMITATIONS

There is no merit to the nominal defendants' argument that the statute of limitations bars the SEC's claim against them. The controlling law provides that "no statute of limitations will be applied in civil actions brought by the Government, unless Congress explicitly imposed such time limitations." *Dole v. Local 427*, 894 F.2d 607, 610 (3rd Cir.1990). This rule applies even when the government litigation "has private beneficiaries," so long as "public policies are served and the public interest is advanced by the litigation." *Id.* at 612. In bringing this action against the nominal defendants, the SEC has clearly made a determination that the action advances the public interest. Accordingly, this action is not barred by a statute of limitations.

### HOLDINGS

In sum, the Court makes the following holdings:

1) Eddie Antar caused the sale of the custodial stock; he was the person who made the decision to sell.

2) The nominal defendants have failed to prove that Deborah Rosen Antar decided to sell the custodial stock.

3) Deborah Rosen Antar's testimony during the trial was not credible.

4) Eddie Antar sold the custodial stock at a time when he had material, nonpublic information regarding a financial fraud at Crazy Eddie, Inc.

5) This Court has subject matter jurisdiction over the SEC's claim against the nominal defendants.

6) The SEC is entitled, under the doctrines of constructive trust and unjust enrichment, to disgorgement of the illegal profits arising from Eddie Antar's sale of the custodial stock.

7) The SEC's claim against the nominal defendants is not barred by a statute of limitations.

**SO ORDERED.**